Berry HALL, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee

2012–SC–000423–MR

Supreme Court of Kentucky.

RENDERED: AUGUST 20, 2015

COUNSEL FOR APPELLANT: Emily Holt Rhorer, Assistant Public Advocate

COUNSEL FOR APPELLEE: Jack Conway, Attorney General of Kentucky, David Wayne Barr, Assistant Attorney General

## OPINION OF THE COURT

Appellant, Berry Hall, was found guilty but mentally ill of murdering Lisa and Alan Tackett by shooting them and wantonly endangering their four children. The facts surrounding the shootings were largely undisputed, and the primary issue at trial related to Hall's affirmative defense of insanity and alternative claim of extreme emotional disturbance.

On appeal, Hall challenges his convictions on numerous grounds, including that extremely gruesome crime scene and autopsy photos of the victims were improperly admitted, and that he was entitled to a directed verdict on four first-degree wanton endangerment counts. The Court finds that the directed verdicts were properly denied but that the improper admission of excessive highly prejudicial photographs requires Hall's convictions be reversed and the case remanded for a new trial on all charges.

## I. Background

On March 20, 2008, Berry Hall was sitting on a couch in the living room of his Floyd County home. His then-wife Charlotte,[1] their three adult sons (Matt, Tony, and Bobby), and Matt's girlfriend (Darcy Hicks) were also present. It was Charlotte's birthday. At some point, a dog belonging to the Halls' neighbors, Alan and Lisa Tackett,[2] wandered onto the Halls' porch. Charlotte shooed the dog off the porch, and Lisa, who was in the yard next door, responded that Charlotte had no right to chase away her dog when the Halls had goats running around in her yard. A loud argument ensued between Lisa and Charlotte in front of the Halls' home. Matt and Darcy also became involved in the spat. Charlotte eventually called the sheriff, who advised Charlotte to ignore Lisa. Hall was not involved in the verbal altercation.

Some time later, Hall went upstairs to his bedroom, which had a window looking down onto the front of the Tacketts' home. Lisa Tackett was standing in front of her home. Hall took out his .30–06 deer rifle with scope and began firing out the window. He shot Lisa Tackett in the left side of her chest. Responding to the gun shots, Alan Tackett walked to the front

---

1. Charlotte divorced Berry in 2012 and had remarried by the time of trial.

2. Lisa Tackett was the daughter of Berry Hall's brother, and thus was Hall's niece.

porch. Hall shot Alan twice through the storm door, and he collapsed in the doorway. The Tacketts' four children were somewhere inside the house at the time of the shootings, and they did not come outside until after all three shots were fired.

Charlotte and Matt found Hall in the upstairs bedroom lying on the bed and holding the rifle. Matt had Hall hand him the rifle, which he placed in a corner of the room, and they went downstairs. Hall assisted in removing the children from the Tacketts' house. 911 was called.

When Kentucky State Police Detective Chris Hicks and Trooper Eric Gibson arrived at the scene, Hall was checking Lisa's pulse. They asked Hall what had happened, and he admitted to shooting the Tacketts.[3] Detective Hicks cuffed Hall, read him his rights, and placed him in the back of his cruiser. Three spent .30–06 shell casings were recovered from Hall's front left pocket.

Lieutenant Shawn Welch interviewed Hall at the scene. A recording of the interview was played for the jury. Hall recalled the verbal altercation and then stated, "I can't handle the screaming and hollering and stuff. I just can't handle it. I can't handle it. I can't handle it. I can't handle it." Hall sobbed and rocked back and forth during the interview, and Lieutenant Welch told him to calm down. When asked what happened after the yelling, Hall responded, "I don't know. I just went upstairs and got the damn gun and shot her. I don't understand. I don't know what the fuck I was doing." Hall then admitted to firing three shots from

upstairs inside his house, once at Lisa Tackett and then twice at Alan Tackett when he came to the porch. Hall was also asked about any medical concerns, and he responded, "I have nerves, and I can't tolerate being around people. That's why I can't hold a job." He stated that he took medications "for trying to control [his] temper and [his] nerves and stuff" at the direction of Dr. Charlie Hieronymus. He said he took nerve pills three times a day and another pill once in the evening, and these were supposed to calm him down so he could "tolerate people."

Dr. Jennifer Schott performed the autopsy on Lisa. She testified at trial that the cause of death was a gunshot wound to the torso, and explained that the bullet entered through the left breast and traveled through internal organs before becoming lodged in the right chest wall without exiting the body. After Dr. Schott provided this testimony, the Commonwealth introduced several autopsy photographs of Lisa, and Dr. Schott described the contents of the images.

Dr. Cristin Rolf performed Alan's autopsy. She testified that the cause of death was gunshot wounds to the head, torso, left arm, and hand, resulting in significant brain and skeletal injuries.[4] Dr. Rolf explained, in detail, the results of her autopsy, including the specific mechanisms of injury. As with Dr. Schott, the Commonwealth then introduced through Dr. Rolf several autopsy photos of Alan and had the medical examiner repeat her testimony de-

---

3. Detective Hicks testified that Berry responded, "I lost it and killed them." Trooper Gibson recalled the response as, "I went crazy. I had enough."

4. Three bullet fragments were recovered from the head, trunk, and upper left arm. Evidence showed that one of the rounds had first

struck an arm of a steel porch swing, causing the bullet to fragment, before traveling through the storm door glass and striking Alan in the head, torso, and upper arm. The nature of the injury to the left hand indicated that Alan had been shot through the back of the hand.

scribing the injuries while referencing the actual images.

The defense theory at trial was that Hall, who had numerous stressors in his life at the time of the shooting and suffered from low intellectual functioning and major depression, had "snapped" and thus acted under temporary insanity, which would have required an acquittal, or alternatively that he acted under extreme emotional disturbance, which would have required conviction of the lesser offense of first-degree manslaughter. *See* KRS 507.030(1)(b).

To this end, the defense presented extensive lay and expert medical testimony, along with medical records, about Hall's history of mental illness. Since at least 2003, Hall had received treatment from a family physician, Dr. Charlie Hieronymus, for depression and anxiety. During the intervening years, Hall was prescribed various psychiatric medications. Family members and neighbors testified generally that Hall's appearance and mental state had been gradually declining for many months leading up to the shootings. He had many stressors in his life, including having a troubled marriage, being unemployed, and relying on his children for support. Evidence also showed that Hall exhibited low intellectual functioning. In addition, evidence was presented of a striking family history of mental illness.[5]

Dr. Hieronymus started Hall on Prozac in December 2007. Hall did not follow up with Dr. Hieronymus again prior to the shootings. Dr. James Walker, a forensic neuropsychologist, and Dr. David Street, a professor of psychiatry at Vanderbilt School of Medicine, testified to the potential adverse effects Prozac can have in certain people affecting their behavior and decision making. Their diagnoses included major depressive disorder and borderline intellectual functioning. Dr. Street opined that the stressors in Hall's life, his major depression, starting Prozac, and his low intelligence had combined to make him very susceptible to snapping, and he had thus been impaired in his ability to behave in conformance with the law.

The jury was instructed on intentional and wanton murder and first-degree manslaughter under extreme emotional disturbance (EED) as a possible lesser-included offense as to both Lisa and Alan Tackett. The jury was also instructed on four counts of first-degree wanton endangerment related to the four Tackett children. In addition, the jury was instructed on insanity as a defense under KRS 504.020 as well as the option of finding the defendant guilty but mentally ill under KRS 504.120 and 504.130. The jury ultimately found Hall guilty but mentally ill of both counts of intentional murder and the four counts of first-degree wanton endangerment. He was sentenced to life without the possibility of parole.[6]

---

5. Briefly, testimony of family members at trial showed that Hall's father suffered from anxiety and paranoia; his older sister dealt with issues of depression and anxiety; another sister had spent time in a mental hospital; another sister is bipolar; another sister resides in a home in Paintsville as a result of her mental illness; a brother shot a neighbor, purportedly because of mental illness, and had to serve time in prison; another brother quit working, receives disability, and takes Paxil because of anxiety and nerves; and, finally, another brother has been disabled for

twenty years due to mental illness, had previously made several suicide attempts, and also briefly took Prozac, which caused him to be angry.

6. Specifically, he was sentenced to life without parole for each murder, with those sentences to run consecutively. He was sentenced to five years' imprisonment for each wanton-endangerment count, with those sentences to run concurrently with the life sentences.

Hall now appeals to the Court as a matter of right. *See* Ky. Const. § 110(2)(b). Additional facts will be developed as needed in our analysis below.

## II. Analysis

### A. The trial court's admission of the prosecution's entire offer of 28 crime scene and autopsy photographs was prejudicial error.

The Commonwealth introduced a 10 minute police video documenting the crime scene and a total of 43 crime scene and autopsy photographs, 28 of which were admitted over objection.[7] Hall argued to the trial court, and maintains on appeal, that the contested photographs were needlessly cumulative, introduced with the intent to inflame the passions of the jury, and lacked probative value that was substantially outweighed by their prejudicial nature. This Court agrees in part.

The nature and content of the 28 crime scene and autopsy photos is indispensible to our analysis, in part because some of the images are very graphic, while others are not. Detailed descriptions of the images are thus necessary.

The first photograph, Exhibit 12,[8] is a view of the Tacketts' front yard and porch from a distance. It shows Lisa's body, lying face up, at the foot of the porch steps. It also shows Alan's body, partially hidden from view, lying on the porch. To the left of Alan's body, an open storm door, with shattered glass, is partially obscured by a porch column. No blood, soft tissue, or other specific evidence of injury is discernable. Exhibit 13 is a photo of the same scene but taken approximately 20 to 30 feet closer to the house. Exhibit 14 is

also focused on Lisa's body from a similar distance but was taken from an angle approximately 45 degrees to the right of Exhibit 13.

Exhibit 15 is another photo taken directly in front of the house at a distance somewhere between that of Exhibits 12 and 13. It was taken from a lower vantage point than the previous images (as if the photographer was kneeling on the ground), and shows the bodies of both victims.

Exhibit 16 is taken from about the same position as Exhibit 13, but is directed straight ahead and focused on the porch and open front door of the house. Lisa's body is visible from the neck down and the lower portion of Alan's body can be seen.

Exhibit 17 is taken from a similar but closer vantage point. Lisa's left foot is in the frame, and blood can be seen on Alan's pants near his left groin. A hole several inches in diameter can be seen in the storm door's damaged glass.

Exhibit 18 is again the same view, only taken several feet closer to the porch. The blood stain on Alan's pants and the position of his body in the doorway is more clearly discernable, as is the damaged glass of the storm door. A second bullet-size hole can be seen in the storm door glass just above the bigger hole. Blood spatter is evident on the porch, storm door, and exterior and interior walls.

Exhibit 19 is taken from on the porch and shows the bottom right corner of the storm door and most of Alan's body extended toward the top of the photo. Alan's right arm is extended from his body, and his left arm and hand are shielded from view by a wall of the house.

---

7. All of the photographs were shown to the jury through the use of a digital projector that magnified the images and displayed them on a television screen.

8. Because all of the photographs herein discussed were exhibits introduced by the Commonwealth, we refer to each only as "Exhibit [number]."

Blood can be seen on his sweatshirt and groin area. Alan's body is lying face up, and the view of his head and face is from below his chin, cutting off the view of the top of his head and face. Blood can be seen on his chin and nose. There is a pool of blood around the head and upper torso, and the house's exterior and interior brick wall behind the body are covered in blood and soft tissue spatter.

Exhibit 20 was taken from inside the house and to the left of the previous exhibits, pointing down towards Alan's body. This is the first photo depicting the scene in an extremely graphic manner. The entire body from about mid-thigh and up is in the frame and clearly discernable. In addition to the blood stains on the shirt and groin, there is also clearly other blood and soft tissue spatter on his sweatshirt and other surfaces around his body. The entire left arm is clearly visible in this photo. The photo shows that Alan's left hand was essentially exploded by a bullet. What remains of his left hand is mangled and bloody, and the digits are positioned unnaturally and pointing in multiple directions. Alan's bloody face and the gunshot wound in the right forehead-scalp area are also unavoidably discernable. His eyes are open, and his face is bloody and disfigured by numerous lacerations and abrasions. The gunshot wound to the head is a dark red void approximately four inches wide that is without scalp and hair, and there is a pool of bright crimson blood, congealed or congealing, extending several feet from the head wound.

Exhibit 21 is looking directly down on Alan's body from the doorway of the residence and was taken much closer than Exhibit 20. Alan's head, the pool of blood around his head, and most of his upper torso, including the right shoulder and right arm to just above the wrist, are framed in this photo. This photo depicts nothing that is not included in Exhibit 20 described above, but the grotesque details of this close-up photo are undeniably more vivid.[9]

Similarly, Exhibit 22 is a close-up image of Alan's left arm and hand. This photo shows the mangled state of the left hand in higher resolution, but otherwise is also duplicative of parts of Exhibit 20.

Exhibit 23 is a close up shot of Alan's left leg. A portion of the blood stain in the left groin region is included within the frame.

Exhibits 28 to 32 are close-up photographs of pieces of blood and soft tissue ranging in size from a couple millimeters to a couple inches in various locations on the porch, in the yard, and on an interior wall of the house.

Exhibits 39 to 42 are autopsy photos of Lisa. As noted above, these were introduced after the medical examiner had already testified and were used to revisit portions of that testimony.

Exhibit 39 is of the left side of Lisa's naked corpse. It shows the entrance wound on her left breast and a "pattern abrasion" of unknown origin, which the medical examiner testified did not contribute to the cause of death.

9. The admission of this photograph was particularly troubling, not only because it was duplicative of Exhibit 20, albeit in somewhat finer and more vivid detail, but also because of the manner in which the Commonwealth introduced it at trial. Exhibit 21 was shown to the jury for more than two minutes while the prosecutor elicited testimony from the investigating detective. This was a significantly longer period of time than any of the other crime scene photos were displayed. Perhaps most troubling, though, is that most of the testimony elicited by the prosecutor while Exhibit 21 was on display concerned details not actually shown by that specific photograph.

Exhibit 40 is a close-up of the left breast showing the entrance wound.

Exhibit 41 is a close-up of the right side of Lisa's torso; it depicts a small abrasion and raised area near the bottom of her right ribcage showing where the bullet lodged without exiting the body.

Exhibit 42 is an autopsy photo of the right side of Lisa's naked torso after the bullet was removed, showing the open cut made by the medical examiner to remove the bullet.

Exhibits 45 to 51 are autopsy photos of Alan. Like the other autopsy photographs, these were introduced after the medical examiner had already testified and were used to revisit portions of that testimony.

Exhibit 45 is of Alan's head. Extensive damage to the scalp, skull, and facial bones is evident. It also shows bruising and pseudo-stippling[10] around the right eye and temple as well as an abrasion at the end of the nose.

Exhibit 46 is a close-up of the gunshot wound to Alan's head. It shows the wound at a higher resolution.

Exhibit 47 is a close-up of Alan's skull without the scalp, showing the extensive damage caused by the bullet. The scalp has been cut at the back of the head and peeled away from the skull, back to front, and where the peeled away scalp meets back up with the head and face is clearly discernable.

Exhibit 48 is a close-up of Alan's left arm and chest. It shows a wound on the upper arm near the shoulder. It also shows pseudo-stippling on his chest between his left nipple and shoulder.

Exhibit 49 shows the left side of Alan's naked torso and abdomen. It shows extensive pseudo-stippling down his left side and stomach.

Exhibit 50 is a photo of Alan's left upper extremity. It shows the wound near the shoulder. It also shows the mangled left hand, with the back of the hand facing out. Bone, tendons, and muscle are clearly visible. Several fingers appear to have been almost completely detached from the hand.

Exhibit 51 is a close up of only the left hand, with the palm facing out. It shows in greater detail the damage to the hand.

Analysis of the admissibility of the photographs begins by examining the trial court's basis for admission of all of the photographs in question. In overruling Hall's objection, the judge rested solely on his "acknowledge[ment] of the long line of cases" allowing for admission of gruesome crime photos.

It is true that prior decisions of this Court have generally approved of the admission of graphic photos. *See, e.g., Brown v. Commonwealth*, 934 S.W.2d 242, 248 (Ky.1996) (applying, without elaboration, a previous holding that "where a defendant has ple[aded] not guilty, it is indispensible to the Commonwealth's case to establish that a crime has in fact been committed . . . [and] the selected photographs offered into evidence . . . constituted relevant and probative evidence of the circumstances of the crime" (second alteration and omissions in original) (quoting *Sanders v. Commonwealth*, 801 S.W.2d 665, 676 (Ky.1990)) (internal quotation marks omitted). And as a result, our case law has been interpreted as laying out a bright line rule that gruesome victim pho-

---

**10.** As the medical examiner explained at trial, "stippling" occurs when a gun is fired within inches of the body and gunpowder particles hit the skin and create small lesions around the bullet entrance wound. "Pseudo-stip-pling," on the other hand, is caused by other foreign fragments—here, the fragments of glass from the storm door—striking the body as a result of the bullet traveling through an intermediate medium.

tos are per se admissible subject only to clearly delineated exceptions, such as when the body had been mutilated or has decomposed. *See, e.g., Clark v. Commonwealth,* 833 S.W.2d 793, 794 (Ky.1991) ("This general rule [of admission] loses considerable force when the condition of the body has been materially altered by mutilation, autopsy, decomposition or other extraneous causes, not related to the commission of the crime . . . .").

■ But even under the general rule, such photographs are not *automatically* admissible. Like all evidence, they are subject to the balancing test of KRE 403: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. As Professor Lawson points out, "Rule 403 defines the most important and far-reaching of all the exclusionary rules of the law of evidence." Robert G. Lawson, *Kentucky Evidence Law Handbook* § 2.20[6] at 101 (5th ed. 2013). We now make clear that in all cases in which visual media showing gruesome or repulsive depictions of victims are sought to be introduced over objection, as with all other types of evidence, the trial court must conduct the Rule 403 balancing test to determine the admissibility of the proffered evidence.

■ The general rule that "a photograph, *otherwise admissible,* does not become inadmissible simply because it is gruesome," *Funk v. Commonwealth,* 842 S.W.2d 476, 479 (Ky.1992) (emphasis added), does not relieve the trial court of its gatekeeper role under KRE 403. The trial

judge is always required to weigh the probative value of the gruesome photo in question against the harmful effects that might flow from its admission to determine whether the photo should be excluded notwithstanding the general rule. *Cf. Adkins v. Commonwealth,* 96 S.W.3d 779, 794 (Ky. 2003) ("[P]hotographs that are probative of the nature of the injuries inflicted are not excluded unless they are so inflammatory that their probative value is substantially outweighed by their prejudicial effect.").

■ There are three basic inquiries that the trial court must undertake when determining admissibility of relevant [11] evidence under Rule 403. First, the trial court must assess the probative worth of the proffered evidence; second, it must assess the risk of harmful consequences (*i.e.,* undue prejudice) of the evidence if admitted; and last, it must evaluate whether the probative value is substantially outweighed by the harmful consequences. *See Webb v. Commonwealth,* 387 S.W.3d 319, 326 (Ky. 2012). These inquiries are very fact intensive and are "totally incompatible with bright line rules and rulings." Lawson, *supra,* § 2.15[2][a] at 89. Their resolution is highly dependent upon the specific contexts in which they arise. "And, '[s]o often is the Rule invoked, and in such a wide variety of circumstances, that individual cases provide little guidance for future rulings.'" *Id.* (alteration in original) (quoting 1 Mueller & Kirkpatrick, *Federal Evidence* 641 (3d ed. 2007)).

■ The "probative value" or "probative worth" of evidence is a measure of how much the evidence tends to make the fact it is introduced to prove more or less probable. The probative force of a partic-

---

11. Only minimal probativeness to a fact of consequence is necessary for evidence to be relevant, *e.g., Springer v. Commonwealth,* 998 S.W.2d 439, 449 (Ky.1999), and thus general-

ly admissible unless excluded by Constitution (federal or state), statute, or other evidentiary rule, *see* KRE 402.

ular item of evidence is, therefore, inherently dependent upon the overall probativeness of other available evidence on that point. *Cf. Old Chief v. United States,* 519 U.S. 172, 182–83, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (holding that evidence should not be viewed "on an island" when making estimates of probative value and undue prejudice but, rather, the "full evidentiary context of the case" should be considered in evaluating the "discounted" probative value in light of other evidence going to the same point); *see also id.* at 185, 117 S.Ct. 644 ("The probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point." (quoting 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5250 (1978))).

When there is already overwhelming evidence tending to prove a particular fact, any additional evidence introduced to prove the same fact necessarily has lower probative worth, regardless of how much persuasive force it might otherwise have by itself. The additional evidence does not appreciably "advance the ball" toward proving that fact. KRE 403 explicitly incorporates this concept by noting that a trial court is to consider "needless presentation of cumulative evidence" in deciding whether to admit evidence.

Thus, in cases like Hall's, the trial judge cannot do a Rule 403 balancing for an individual photo in a vacuum. Instead, the judge must consider the photographs within the full evidentiary context of the case, giving due regard to other evidence admitted as well as evidentiary alternatives, so as to ascertain each item's "marginal" or "incremental" probative worth for purposes of weighing that value against the risk of prejudice posed by the evidence. *See Norris v. Commonwealth,* 89 S.W.3d 411, 416 (Ky.2002) ("[I]n exercising its discretion under Rule 403, a trial court must consider in the balancing test … other available evidence to prove the fact in issue."); *United States v. Beechum,* 582 F.2d 898, 914 (5th Cir.1978) (holding "incremental" probative value, or what the evidence contributes to the persuasive force of other evidence on the same point, must be weighed against prejudice).

In fact, we have specifically stated that this approach applies to gruesome photographs: "When ruling on the admissibility of a gruesome photograph, the trial court should consider whether evidentiary alternatives would sufficiently prove the fact at issue without a comparable risk of prejudice." *Ratliff v. Commonwealth,* 194 S.W.3d 258, 271 (Ky.2006) (citing *Old Chief,* 519 U.S. at 184–85, 117 S.Ct. 644; *Norris,* 89 S.W.3d at 416). We noted, however, that "the evidence must be highly inflammatory and prejudicial to compel a party to employ evidentiary alternatives." *Id.* "Were the rule otherwise, the state would be precluded from proving the commission of a crime that is by nature heinous and repulsive." *Id.* (quoting *Salisbury v. Commonwealth,* 417 S.W.2d 244, 246 (Ky.1967)). In essence, this is another way of saying general gruesomeness by itself, while prejudicial, is an insufficient ground to keep out relevant evidence; rather, the gruesomeness must be such that it creates substantial undue prejudice or other harmful consequences that outweigh the probativeness of the evidence.

Once the trial court has assessed probative value, it must then assess the undue prejudice that might flow from the evidence if admitted. The primary danger [12]

---

**12.** A second danger not at issue here "arises when evidence has both legitimate and illegitimate uses in a case," Lawson, *supra,* § 2.15[3][b] at 92, such as impeachment evidence that is inadmissible to prove an element of the case.

from such evidence is "emotionalism"—*i.e.*, that the graphic photos will "arouse biases and sympathies, provoke animosities, and inflame passions that obstruct careful thought and judgment." Lawson, *supra*, § 2.15[3][b] at 92. This risk was particularly acute in the present case, where the defendant was being tried for capital offenses and the primary issue for the jury was whether his mental and emotional state at the time of the shootings warranted an acquittal or conviction on a lesser offense than intentional murder (*i.e.*, first-degree manslaughter). And the danger that the jurors' decision making would be unduly tainted by their sympathy for the victims and animosity toward the defendant as a result of the introduction of the photos in question was further exacerbated by the prosecutor's statements during closing argument repeatedly emphasizing their gruesome nature to illustrate why Hall's mental-illness defenses should not be accepted.[13] *Cf. Foley v. Commonwealth*, 953 S.W.2d 924, 935 (Ky.1997) (no reversible error where "the photos were shown only briefly, and were not emphasized in any way").

In Hall's case, the probative value of many of the gruesome photos was quite low. There was no material dispute of the facts that the Commonwealth sought to use the photos to prove. And there was more than enough alternative evidence—including the less gruesome photos, extensive lay and expert witness testimony, and the crime scene video—to easily prove the same facts beyond a reasonable doubt.

■ We recognize that the Commonwealth does have the typically onerous burden of proving the *corpus delicti* beyond a reasonable doubt, and that photos of a victim's corpse are relevant to show the nature of the injuries inflicted on the victim. *See, e.g., Ernst v. Commonwealth*, 160 S.W.3d 744, 757 (Ky.2005). And we have consistently held that the Commonwealth may "prove its case by competent evidence of its own choosing, and the defendant may not stipulate away the parts of the case that he does not want the jury to see." *Pollini v. Commonwealth*, 172 S.W.3d 418, 424 (Ky.2005). *But see Anderson v. Commonwealth*, 281 S.W.3d 761 (Ky.2009) (holding that defendant charged with being a felon in possession of a firearm may stipulate or admit to having been previously convicted of a felony and thus prevent the Commonwealth from introducing evidence of the prior felony). That notwithstanding, the Commonwealth's prerogative in dictating the specific evidence used to prove its case is not without limit, and Rule 403 is perhaps the most important check on the Commonwealth in this respect.

■ In light of the aforementioned principles, it is clear that graphic evidence of a gruesome crime will typically be rele-

---

**13.** In his guilt phase closing argument, the prosecutor pointed out to the jury,

> You seen what [the first bullet] did to [Alan's] hand, to his side. You seen the close up pictures of the scene ... the blood, the pieces of Alan basically blown all over the place on the porch and inside the house....
>
> You seen how [the second bullet] cracked his skull like a walnut five different ways.

The prosecutor then discussed the "devastating impact on the four other victims in this case." He stated, "[Berry Hall] did [the shooting] in a way that ensured that these kids would have to see it. You saw the scene. You heard the 911 call [of the children screaming]. They didn't see pictures. They saw for real."

Finally, after discussing Hall's claim of extreme emotional disturbance and pointing out that would allow him to be convicted of a lesser offense than murder, the prosecutor stated, "You saw what he did to these people. You think that's something less than murder?"

vant and have probative value that is not substantially outweighed by the inflammatory effects of the evidence. But this will be true only up to a point. Not only will the probative worth of each additional gruesome photograph be incrementally discounted as the facts to be proven become ever more certain, but admission of additional photos will also correspondingly increase the danger of undue prejudice. That is, as the jury is confronted with gory image after gory image, the inflammatory and prejudicial effect of the images as a whole increases, while the marginal probativeness of each new image is less than the one before. The two concepts are inversely related, and at some point, the marginal probative worth of an additional photo will certainly be substantially outweighed by the risk that the jury's decision-making will be improperly influenced by bias, sympathy, or animosity engendered by the additional inflammatory evidence. In the present case, that point was far exceeded.

Some of the photographs in question were admissible to allow the Commonwealth to prove the *corpus delicti*, as they showed both the crime scene and the devastating wounds suffered by the victims. But admission of the entire proffer of 28 photos went well beyond that. While a few photos necessary to show the commission of the crimes and the nature of the victims' injuries were properly admitted, the numerous photos introduced thereafter were cumulative and added little, if any, persuasive force to the other evidence proving the crime and the circumstances surrounding its commission. At the same time, the corresponding danger of inflaming the passions of the jury to the prejudice of Hall's affirmative defenses skyrocketed from the admission of these voluminous and incredibly gruesome images.

Simply by way of example, Exhibit 20, while graphic and gruesome, depicted the full extent of the injuries suffered by Alan Tackett. Were it the only photo offered of those injuries, it would likely fit within the general rule for gruesome photos and thus be admissible. But rather than resting with this photo, the Commonwealth then introduced Exhibits 21 and 22, which showed the same injuries close up and in greater detail. The prejudice was further amplified by the fact that the Commonwealth showed the photos blown up on a television screen and left Exhibit 21 up for more than two minutes while eliciting testimony from the investigating detective concerning details not actually shown by that photograph. By admitting these additional photographs, which had substantially lower marginal probative value and substantially more prejudicial effect, the trial court allowed the Commonwealth to cross the line into arousing the sympathies and inflaming the passions of the jury. And after these photos were admitted, still others were introduced— in particular, the photos of soft tissue spatter and the multiple autopsy photos [14]—likely

14. The autopsy photos present another example of how probative value was fax outweighed by prejudicial effect here. As noted above, these photos were admitted *after* the medical examiner had testified about the nature of the injuries and the causes of death. They were then used to revisit that testimony. At that point, they added little to the discussion, were cumulative, and bordered on being completely unnecessary.

That is not to say, though, that autopsy photos are necessarily inadmissible under Rule 403. Rather, the probative value of such evidence will often be more than sufficient to justify its admission when its presentation in conjunction with a medical examiner's testimony will truly assist the jury in determining, e.g., the cause or mechanism of a victim's death. In this case, however, that the medical examiners were able to first testify about

further upending the 403 balance toward undue prejudice. And all of this evidence was admitted despite the primary issue in the case being Hall's state of mind, not whether or how the crime was committed.

This is not to say that any given photo was inadmissible solely because of its gruesome nature. Such a conclusion would go against the general rule and overall inclusionary thrust of the Rules of Evidence. But the photographs in this case were not addressed one by one or even in comparison to each other; rather, their admissibility was determined all at once as a group, with no emphasis on their relative or incremental probative value. That is where the trouble lies in this case.

We acknowledge that the balancing required by Rule 403 is "a task properly reserved for the sound discretion of the trial judge" and is thus reviewed only for abuse of discretion. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999). But the trial court's authority, while "substantial," is "not unlimited." *Brock v. Commonwealth*, 947 S.W.2d 24, 29 (Ky. 1997).

In a few instances, this Court has held that gruesome photographs were inadmissible, *see, e.g., Clark v. Commonwealth*, 833 S.W.2d 793, 794–95 (Ky.1991), though more often than not we have concluded that such "photographs, though indeed gruesome, do not approach instances where this Court has overturned a lower court's ruling on admission," *Ratliff*, 194 S.W.3d at 271. This is the rare case that does approach—and indeed joins—those instances. Several of the photos fall in the upper echelon of gruesome photos that this Court has confronted in recent years. On top of that is the sheer number of gruesome photographs admitted. Indeed, in light of their needlessly cumulative and

often duplicative nature, it is difficult for us to surmise any reason for introducing all 28 photos other than to elicit unduly prejudicial emotional responses from the jurors. This is the prototypical case where Rule 403 required the trial judge to comb through and exclude many of the offered photographs; it required the judge to recognize and safeguard against the enormous risk that emotional reactions to the inflammatory photos would obstruct the jury's careful judgment and improperly influence its decision, and the judge failed to do so.

In the absence of specific findings in the record explaining the trial court's reasons for its decision, we cannot conclude that the admission of all 28 graphic crime scene and autopsy photos proffered by the Commonwealth was anything but "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945. The simple fact is that the probative value of admitting all 28 photographs was substantially outweighed by the undue prejudice created by the photographs. Moreover, the admission of all 28 photographs, many of which depicted the same scene or subject merely from different vantage points, was needlessly cumulative. This Court, therefore, concludes that this case presents the rare instance of an abuse of the trial court's discretion under Rule 403 in admitting gruesome photographs.

■■■ We must next determine whether this error warrants reversal of Hall's conviction. Since this was a nonconstitutional evidentiary error, we apply the test laid out in *Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89, and n.1 (Ky.2009), to determine whether the error was harmless. Such an error may be "deemed harmless, … if the reviewing

the wounds without the photographs demon-

strates their low probative value.

court can say with fair assurance that the judgment was not substantially swayed by the error." *Id.* at 689 (citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). "The inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Id.* (quoting *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239).

After considering the full record and pondering all that transpired throughout the course of Hall's trial, this Court simply cannot say with fair assurance that the verdict was not substantially swayed by the erroneous admission of all 28 photos. At the very least, the Court "is left in grave doubt," and thus, "the conviction cannot stand." *Id.* This Court has little doubt that the horrific and inflammatory photographs improperly admitted in this case, and repeatedly emphasized by the Commonwealth during trial, substantially influenced the jury's decision to reject the defendant's affirmative defenses and, instead, convict him of intentional murder. The fact that Hall was found guilty but mentally ill drives home this point since the jury clearly put some stock in Hall's claims of insanity and EED; and the emotional responses flowing from the error here certainly would have influenced the final balance tilting in favor of a verdict of guilty but mentally ill rather than not guilty by reason of insanity or, more likely, a finding of guilt as to first-degree manslaughter under EED. Therefore, we cannot conclude that the erroneous admission of the inflammatory photos was harmless. Finding prejudicial error, we reverse Hall's murder convictions and remand for a new trial. On remand, the trial court is hereby directed to conduct the requisite KRE 403 balancing for each objected-to photograph as laid out above, and the trial court should make a record of its reasons for its findings on admissibility under the Rule. *See Norris,* 89 S.W.3d at 416.

**B. The trial court did not err in denying directed verdicts on the four charges of first-degree wanton endangerment of the four Tackett children.**

At the close of the proof, Hall's trial counsel specifically moved for directed verdicts on the first-degree wanton endangerment charges related to the four children who were in the Tacketts' house at the time of the shootings. When deciding a motion for directed verdict, a trial judge "must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth." *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991). The judge must "assume that the evidence for the Commonwealth is true, but reserv[e] to the jury questions as to the credibility and weight to be given to such testimony." *Id.* The trial court should not give a directed verdict "[i]f the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty." *Id.* On appeal, a reviewing court must determine "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt." *Id.* If so, "then the defendant is entitled to a directed verdict of acquittal." *Id.*

First-degree wanton endangerment is established "when, under circumstances manifesting extreme indifference to the value of human life, [a person] wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person." KRS 508.060(1). "Firing a weapon in the immediate vicinity of others is the prototype of first degree wanton endangerment." *Swan v. Commonwealth,* 384 S.W.3d 77, 102 (Ky.2012) (quoting Robert G. Lawson

& William H. Fortune, *Kentucky Criminal Law* § 9–4(b)(2) at 388, and n.142 (1998)) (internal quotation marks omitted). And "[t]his would include the firing of weapons into occupied vehicles or buildings." *Id.* As we recently cautioned, however, these are simply examples of the severity of behaviors necessary to be considered first-degree wanton endangerment. *See id.* at 103. To be convicted, the defendant must have both acted with the requisite mental state and created the danger prohibited by the statute.

This Court recently addressed evidentiary sufficiency when wanton endangerment is at issue in *Swan*, 384 S.W.3d 77. The defendants in *Swan*, armed with handguns, fired shots upward into the ceiling of a home, directly into the fireplace connected to an outside wall, and toward specific victims in the living room located in the front of the home. *Id.* at 84–86. A majority of this Court agreed that none of those shots endangered Ms. Lumpkins, a woman who was hiding in a back-bedroom. Our conclusion flowed from the fact that "[n]o evidence showed that a bullet was fired in Ms. Lumpkins's *direction.*" *Id.* at 103 (emphasis added). Accordingly, we held that the trial court in *Swan* erred in failing to grant a directed verdict on the charge of first-degree wanton endangerment as to the hidden victim. *Id.*

In this case, given the nature of the weapon used and the direction in which the shots were fired, *i.e.*, a high-powered rifle fired through a glass storm-door into the interior of the occupied home, the wanton endangerment issue cannot be resolved by our holding in *Swan*. More factually analogous, in *Paulley v. Commonwealth*, 323 S.W.3d 715 (Ky.2010), one of the defendants, Henry Gunn, fired three shots from a shotgun into the closed doorway of Adolphus Stone's home, hitting and killing a victim on the other side of the door. *Id.* at 723, 726. The trial court refused to grant the defendant a directed verdict on nine counts of wanton endangerment, one for each person present in the home at the time of the shooting. *Id.* This Court affirmed the trial court, concluding that the defendant was "properly charged with wanton endangerment as to *each person who was inside Stone's home when Gunn fired into it.*" *Id.* at 724 (emphasis supplied). Notably, the Court did not consider the precise location of each of the victims inside of Stone's home in affirming the denial of the directed verdict. Finally, the *Paulley* Court concluded that with respect to wanton endangerment, a single gunshot can endanger multiple people.

The weapon Hall fired, a .30–06 rifle commonly used in deer hunting,[15] is an incredibly powerful firearm. Unlike the handgun shots fired short-range by the *Swan* defendants at specific targets, Hall fired this high-powered hunting rifle from his bedroom window into the entryway of the family home where Alan Tackett stood. "Like the danger of ricochets, it is also well-known that bullets can go through and endanger people beyond the walls of a structure." *Swan*, 384 S.W.3d at 103. Furthermore, we know from the evidence presented at trial that one of the rounds traveled through the arm of a metal porch swing before striking Alan Tackett, whose body was found lying in the threshold of the door, partly positioned *inside* of the home. Alan Tackett's final resting place is important because it establishes his approximate position with respect to the interior of the home when he was shot—to wit, close enough to the entryway of the home to fall across the threshold of the doorway. Therefore, not only was Hall's hunting rifle capable of firing shots through interme-

---

**15.** In the police interview after the shooting, Hall refers to the weapon as a "deer gun."

diate materials, the shots in fact *did travel through intermediate materials.* This proof, coupled with the evidence that the children were close enough to be heard on a 911 call placed by Alan (and discussed *infra*), is sufficient to withstand the scrutiny of our directed verdict analysis.

Based on these facts, our *Paulley* case serves as a more appropriate guidepost in our wanton endangerment analysis, and supports affirming the trial court. Notably, this Court cited *Paulley* in our *Swan* analysis for comparison, positing that the "[defendants in *Swan*] were not firing blindly into an occupied house, such as through a locked door", like the defendant in *Paulley. Id.* at 103. We cannot make the same distinction in this case, as the evidence established that Hall *was* firing "into an occupied house" and like the defendant in *Paulley* he was wielding a long gun, in this case a high-powered hunting rifle. *Id.* Hall's deadly aim notwithstanding, the danger to anyone inside the home was substantial. It was only fortuitous that Hall's "sure shot" did not strike one or more of the four young Tackett children as it continued on its violent path through the doorway and toward their home. *See Hennemeyer v. Commonwealth,* 580 S.W.2d 211, 215 (Ky.1979) ("We have no difficulty in arriving at the conclusion that [the wanton endangerment statute] was designed to protect each and every person from each act coming within the definition of the statute.").

Perhaps most importantly, this issue turns on whether it was *clearly unreasonable* for the jury to find Hall guilty of wantonly endangering the Tackett children. *Benham,* 816 S.W.2d at 187. To survive a motion for a directed verdict, the Commonwealth must produce more than a "mere scintilla" of evidence. *Id.* In addi-

tion to the evidence of the type of weapon used and Alan Tackett's position in the doorway, the Commonwealth introduced, over defense objection, an audio recording of an "open line" 911 call that took place following the shootings and on which children can be heard screaming and crying.[16] The Commonwealth's basis for introducing the evidence was to show the proximity of the children to the shootings. While the 911 call in which children can be heard screaming does not prove the exact location of the children at the time of the shooting, it is reasonable to assume that the call came from the cordless phone found under Alan Tackett's leg. This, of course, leads to the inference that Alan placed the call after his wife was shot and mere seconds before being felled by Hall's shots, with the children close enough to be heard screaming on the line. Viewing the evidence and the reasonable inferences associated with that evidence in the light most favorable to the Commonwealth, there was enough evidence, that is, more than a mere scintilla, to justify presenting the wanton endangerment charges to the jury. *Id.* at 187. The wanton endangerment charges may be retried on remand.

## C. Other claims of error.

Because we find that the admission of the inflammatory photographs discussed above merits reversal of Hall's convictions, we address the remaining assignments of error only to the extent they are likely to recur on retrial if the evidence presented is substantially similar and guidance from this Court would be valuable. *E.g., Southworth v. Commonwealth,* 435 S.W.3d 32, 55 (Ky.2014).

### 1. The "open line" 911 call.

Hall claims the audio recording of

16. Hall's objection to the 911 call is discussed separately in this opinion.

an "open line" [17] 911 call made on the date of the shootings should not have been admitted, arguing (1) that the recording was not properly authenticated, and (2) that it was not relevant and presented a danger of undue prejudice and misleading the jury that substantially outweighed any probative value it might have.

The audio recording in question is approximately 15 minutes in duration. Initially, other than the dispatcher's voice, all that can be heard is children in the background screaming and crying. The crying can be heard for about two minutes. A dog can be heard barking for much of the remainder of the call. Berry Hall's voice can also be heard a few times thereafter. About six minutes into the call, he says, "Don't come in here Tony. Get the fuck outta here." A couple minutes later he can be heard shooing away a dog, and several minutes after that, Berry can be heard asking where the ambulance is and stating, "They better hurry." The testimony at trial established that the open line 911 call was made at 6:27 p.m. A second 911 call was placed by Tony Hall at 6:30 p.m., at which time the dispatchers realized the calls were related.

We disagree with Hall's assertion that the recording was not properly authenticated. Hall takes issue with the fact that no "CAD report" [18] was generated with respect to the open line call. The only CAD report generated was of the second 911 call made by Tony because both calls encompassed only one incident. This re-port included a cross-reference to the open line call taken by another dispatcher, but it did not record the name, phone number, and address of the first call, which is information that would have been available had a separate CAD report been generated for this call. Hall argues that because of this—coupled with the failure of the police to collect as evidence the cordless phone found underneath Alan's left leg, determine its phone number, and obtain a call log—the recording should have been excluded because there was no evidence of who made the call or from what phone it was made.

■ Authentication is a foundational requirement or condition precedent to admissibility. Before evidence may be admitted, there must be "evidence sufficient to support a finding that the matter in question is what its proponent claims." KRE 901(a). The Rule provides a list of methods of authentication "by way of illustration only," KRE 901(b), which are meant only as examples and are not exclusive. "The burden on the proponent of authentication is slight; only a prima facie showing of authenticity is required." *Sanders v. Commonwealth*, 301 S.W.3d 497, 501 (Ky.2010). "This means of course that the trial judge decides only if the evidence can be admitted and the trier of fact determines the authenticity of the evidence and its probative force." Lawson, *supra*, § 7.00[2][b], at 502.

Hall cites to our previous decision in *Soto v. Commonwealth*, 139 S.W.3d 827

---

**17.** "Open line" means that no one on the caller's line speaks with the emergency dispatcher who receives the call. The line instead remains open, picking up sounds in the phone's vicinity.

**18.** "CAD" stands for "Computer Aided Dispatch" and generally refers to software systems that support emergency dispatch personnel by, among other things, assisting with the compilation, verification, preservation and retrieval of incident data, including caller and location information. *See generally* Law Enforcement Info. Tech. Standards Council, Standard Functional Specifications for Law Enforcement Computer Aided Dispatch (CAD) Systems viii, A:1–A:5 (2006), *available at* http://www.ijis.org/docs/LE_CAD_FuncSpecs.pdf.

(Ky.2004), to support his argument that the recording was not authenticated because the identity of the caller and the phone used was unknown. The holding in *Soto*, however, is inapplicable here. That case involved authentication of a telephone conversation between a caller and a 911 dispatcher under KRE 901(b)(6)(A), and the identities of the parties to the telephone conversation were necessary in order for the *conversation* to be properly authenticated. In the present case, however, there was no conversation that needed to be authenticated. The exact identity of the caller here is irrelevant (for authentication purposes) to establish that the matter in question is what the proponent says—*i.e.*, an audio recording of an open line 911 call placed on March 20, 2008, at 6:27 p.m., by someone at the Tackett's residence after Lisa and Alan were shot, and during which the 911 operator who took the call overheard children crying and various statements made by Berry Hall. As such, Hall is incorrect in his assertion that the recording could not be authenticated without information identifying the caller; while his concerns here are legitimate, they go to the probative value of the evidence in this case rather than its authenticity. On retrial, direct testimony from the 911 dispatcher who took the call could certainly constitute prima facie evidence of authenticity of the recording itself under KRE 901(b)(1). And testimony that the voice heard on the recording was Hall's would serve to authenticate his statements. *See* KRE 901(b)(5).

With respect to the relevancy issue, the open line 911 call does contain relevant evidence. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. This is a low bar because it deems relevant, and thus presumptively admissible, *see* KRE 402, any evidence that tends to make a fact in consequence more or less probable, even if only minimally so. The statements made by Hall that can be heard on the recording are certainly credible evidence of his state of mind immediately following the shootings, which is no doubt relevant to the determination of his state of mind at the time of the shootings in regard to his claims of insanity and EED.

Therefore, the trial court retains its discretion to make an admissibility determination with respect to this audio recording if offered on retrial and may choose to admit certain relevant portions while redacting portions that are irrelevant or otherwise deemed inadmissible.

### 2. Telephone conversation between the victims.

◼ Hall next claims he should have been able to introduce a taped telephone conversation between Alan and Lisa Tackett that occurred about one year before the shootings on March 20, 2008. The recording was made by Diane Hackworth, Charlotte Hall's sister and neighbor. Diane and Charlotte had apparently been on the phone with each other when a separate phone conversation between Alan and Lisa somehow broke into their call. When Diane realized what she was overhearing, she recorded the conversation. The Tacketts' conversation contained purported threats against the Hall family, and the defense sought to introduce the recording at trial to show the Tacketts intended to be provocative and confrontational toward the Halls and, in fact, engaged in this sort of behavior in the months leading up to the alleged triggering event on March 20, 2008. The Commonwealth responded that there was no dispute that the argument occurred, that the defense just wanted the jury to hear Lisa's foul language, and that

the tape was irrelevant and highly prejudicial. The trial judge could not determine to whom the Tacketts were referring during the conversation nor could he ascertain any direct threat against the Halls or any specific intent or plan to act against Berry Hall. As such, the judge found that, since the contents of the recording were confusing to him, they would also be confusing to the jury, and that the tape's prejudicial effect substantially outweighed any probative value it might have. Having listened to the recorded conversation in question, we must agree.[19]

The recording was relevant in showing the existence of a longstanding history of acrimony between the Tacketts and the Hall family. This evidence was relevant to the EED claim in that it adds context to the altercation on March 20, 2008, and gives credence to the argument that the triggering event was a "straw that broke the camel's back" type of occurrence. The probative value of the recording, however, is low. The recording is very poor quality, and as the trial judge found, it is very difficult to make out what the speakers actually say during the conversation. Indeed, it is next to impossible to discern the subjects of the purported "threats" made by the Tacketts in the course of the conversation or to make out much of the conversation without substantially slowing the recording down and listening to it repeatedly. Moreover, the recording simply contains no discernable statements demonstrating any sort of specific intent, plan, or design to provoke the Hall family in particular.

On the other hand, introduction of the recorded conversation presented a significant danger of undue prejudice against Commonwealth. The statements made by the victims undeniably cast them in a very poor light. The statements made by Lisa Tackett, in particular, are very profane and at times graphic. There is no doubt that these statements posed a substantial risk of eliciting an emotional response from the jury that would unduly prejudice the Commonwealth. Given its low probative value, this Court must agree with the court below that the danger of undue prejudice posed by the recorded telephone conversation substantially outweighed any probative value it might have, and exclusion under Rule 403 is appropriate. While the trial court retains discretion to admit the recording on retrial if the circumstances are different or a better quality recording is produced, this Court cannot say that such a recording must be admitted.

### 3. Detective's opinion testimony on Hall's mental state.

■ Hall next argues that Lead Detective Ben Cramer should not have been allowed to give opinion testimony on the ultimate issue of Hall's sanity. He contends that since the fact that Berry shot and killed the Tacketts was undisputed, his mental instability was the ultimate issue in the case and could only be proven through expert witness testimony. He is mistaken.

We have long allowed lay witnesses to testify as to their opinion on a defendant's sanity or mental state. *See Brown v. Commonwealth*, 934 S.W.2d 242, 248 (Ky. 1996). In so doing, we have also consistently emphasized the requirement that the witness have a sufficient basis on which to form his or her opinion. *See Burgess v. Commonwealth*, 564 S.W.2d 532, 534 (Ky.1978) ("[L]aymen who have had the opportunity by association and

---

19. The Commonwealth also argues that the recording was inadmissible hearsay and was not authenticated. Since we agree that the recording was properly excluded under Rule 403, we do not address additional issues related to its admissibility.

observation to form an opinion as to the sanity of a person, may testify to that opinion, giving the facts upon which the opinion is based so the jury may determine the weight to be given the evidence."); *Abbott v. Commonwealth,* 107 Ky. 624, 55 S.W. 196, 198 (1900) ("[P]ersons who are not experts, but by association and observation have had an opportunity to form an opinion as to the sanity of the person, may testify to that opinion. . . .").

Indeed, the defense itself called several lay witnesses at trial, including friends and family members, to testify as to Hall's mental state leading up to and at the time of the shootings. Hall's problem with the testimony in question, then, appears to be only that it was given by a law enforcement witness rather than some other lay witness. In support of his position, Hall cites to our recent decision in *Ordway v. Commonwealth,* 391 S.W.3d 762 (Ky.2013), and posits that Detective Cramer's testimony "in effect, urged the jury to depend upon his apparent expertise as a police officer and his perception and opinion about matters outside the realm of common knowledge." *Id.* at 776–77. Our holding in *Ordway* does not apply in the present case. In contrast to the testimony in *Ordway,* which involved the opinion of an experienced police detective that the conduct of the accused did not comport to the "stereotypical" conduct of an innocent person who had acted in self-defense, Detective Cramer was not called upon to testify as to matters outside the realm of common knowledge, nor was he asked to comment directly on the guilt or innocence of Hall. The clear implication of our prior case law is that a person's sanity or mental competency is within the realm of common knowledge, and testimony on these matters is admissible if based on adequate association with or observation of the person. Here, Detective Cramer's testimony was based on his own association with and observations of Berry Hall at the crime scene and during subsequent interviews. This certainly constituted a sufficient basis on which to form his opinions as to Hall's sanity and mental competency after the shootings.

### 4. Photograph of the children.

 Hall also claims the Commonwealth should not have been allowed to introduce a photograph showing the four Tackett children in matching pajamas standing in front of a Christmas tree that was taken in December, 2008. He argues against the photo's admissibility on relevance and Rule 403 grounds. In response, the Commonwealth argues that the photograph was admissible evidence to humanize the unavailable victims and show them to be more than a mere statistic. *See, e.g., Hilbert v. Commonwealth,* 162 S.W.3d 921, 927 (Ky.2005). In a retrial of the wanton endangerment charges, the December 2008 photograph of the four Tackett children taken nine months after the event would be properly admissible to show the family members who were endangered and their very young age.

### 5. Applicability of KRE 504(b) to testimony of Hall's ex-wife.

Hall also claims that certain testimony by his ex-wife was privileged confidential marital communications under KRE 504(b). All of the purported communications in question were made when Hall and his wife were still married, although they were no longer married at the time of trial. Therefore, only the marital communications privilege provided by Rule 504(b) was in play at trial and is at issue now. *See, e.g., Winstead v. Commonwealth,* 327 S.W.3d 386, 391 (Ky.2010) ("[T]he spousal testimony privilege [of KRE 504(a) ] ends when the marriage is dissolved . . . [while]

the marital communications privilege of KRE 504(b) ... survives divorce.").

### a. Statements made at the crime scene were not confidential.

 Hall first claims that statements he made to his then wife, Charlotte, at the crime scene while in the back of the squad car were privileged. The testimony in question proceeded as follows:

> Prosecutor: Did you get to talk to [Hall] anymore at the house before he left? Did you get to see him again before he left?
>
> Charlotte: Yeah, a police officer asked me if I wanted to talk to [Hall], and I went to the police car, and [the officer] told me I couldn't touch the police car or bend down into the police car. And [Hall] asked for cigarettes, and the police officer said, "You can't have no cigarettes." And [Hall] told me, "Happy Birthday," and I said, "Hell of a birthday."

Appellant argues that his statement, "Happy Birthday," and his then wife's response, "Hell of a birthday," were confidential communications subject to the Rule 504(b) privilege and that his assertion of the privilege should have barred Charlotte from testifying to them.

Rule 504(b) provides, in part, that "[a]n individual has a privilege ... to prevent another from testifying to any confidential communication made by the individual to his or her spouse during their marriage." KRE 504(b). The Rule goes on to define a "confidential communication" as one that "is made privately by an individual to his or her spouse and is not intended for disclosure to any other person." *Id.* We have previously required there to have been a "positive expectation of confidentiality." *E.g., St. Clair v. Commonwealth,* 174 S.W.3d 474, 479 (Ky.2005).

Based on a thorough review of the record, particularly Charlotte's testimony laid out above, we cannot conclude that the communications in question were confidential. Admittedly, "confidential statements need not be given behind closed doors to retain their confidential character." *Id.* at 480. And "[a] hushed or whispered statement from one spouse to another may be considered confidential depending on the circumstances of its disclosure." *Id.* Here, though, the statements were made in the open air at the crime scene after Hall had been arrested and placed in the back of the squad car. Not only is there no indication that they were made in hushed tones so as to avoid being overheard by others still present at the scene, but it instead appears the statements were made despite the presence of a police officer, who overheard and responded to at least one other statement made by Hall. In fact, the testimony indicates that this same officer had precluded Charlotte from bending down to the car window to allow for a more private conversation in the first place.

For these reasons, we believe that the evidence demonstrated that there was no positive expectation of confidentiality regarding the communications made at the crime scene while Berry was seated in the back of the squad car, and therefore, the statements in question are not subject to the marital communications privilege contained in KRE 504(b).

### b. Testimony regarding topics not addressed during jail visits does not constitute "communications" subject to the privilege.

 Hall next contends that the trial court erred in finding that the privilege did not apply to purported communications made during jail visits between him and Charlotte. The testimony at issue here

relates to the following exchange between the prosecutor and Charlotte:

Prosecutor: Did [Hall] ever give you any explanation as to why he did this?

Charlotte: No.

Prosecutor: Did he ever express any remorse to you?

Charlotte: No.

Thus, the "communications" in question can be more accurately described as an absence of communication. As such, we are confronted with the question of whether such testimony as to a topic not discussed by a spouse nevertheless constitutes a communication for which the privilege may be asserted.

We acknowledge that Kentucky courts have long applied an exceptionally liberal definition of *communication* in this context, *see, e.g., Slaven v. Commonwealth,* 962 S.W.2d 845, 851 (Ky.1997), notwithstanding the recognized principle that marital privileges are to be strictly construed, *see,* e.g., *Bixler v. Commonwealth,* 204 S.W.3d 616, 631 (Ky.2006); see also *Winstead,* 327 S.W.3d at 392–93. In *Slaven,* this Court quoted with approval nineteenth century language from our predecessor court stating that the term

should be construed to embrace all knowledge upon the part of the one or the other [spouse] obtained by reason of the marriage relation, and which, but for the confidence growing out of it, would not have been known to the party.

*Slaven,* 962 S.W.2d at 851 (quoting *Commonwealth v. Sapp,* 90 Ky. 580, 14 S.W. 834, 835 (1890)).

With this broad definition in mind, we must nevertheless conclude that the testimony provided by Charlotte does not involve *communications* to which the privilege could otherwise apply. Charlotte's "knowledge"—that Berry had never explained why he shot the Tacketts and had never expressed remorse for doing so— simply does not involve any sort of discrete conveyance of information which the definition of communication contemplates. This is not a case involving an "admission by silence" of a spouse, *see Commonwealth v. Buford,* 197 S.W.3d 66, 74 (Ky.2006) (discussing "admission by silence" rule and rationale), but rather involves topics that were never broached in the first place, or at the very least, Hall never claimed they had been brought up. And, in any event, this knowledge cannot be said to have been obtained *by reason of the marriage relation*; anybody who visited Berry in jail could have come by this knowledge as well. *Cf. Winstead,* 327 S.W.3d at 393 (holding that one spouse's observation of the time the other arrived home was not a nonverbal confidential communication because the spouse's time of arrival could have been observed by others outside the marriage).

For these reasons, we must conclude that the testimony in question is not covered by the marital communications privilege of Rule 504(b). Since we do so based on our conclusion that testimony as to Hall's general failure to communicate does not constitute *communications* that could be otherwise covered by the privilege, we do not address the additional arguments put forth by the parties regarding the confidentiality, or lack thereof, of the alleged jail visit communications.

## III. Conclusion

For the foregoing reasons, Hall's convictions are reversed, and this case is remanded to the Floyd Circuit Court for a new trial consistent with this opinion.

All sitting. Minton, C.J.; Abramson, Barber, Cunningham, Keller, JJ., concur.

Noble, J., concurs in part and dissents in part by separate opinion in which Venters, J., joins.

### NOBLE, J., CONCURRING IN PART AND DISSENTING IN PART:

I concur in the majority's reversal of Hall's convictions, but I would go a step farther to hold that he was entitled to a directed verdict of acquittal on the four wanton-endangerment counts and thus cannot be retried for them. I disagree with the majority's conclusion that the Commonwealth introduced sufficient evidence to support the wanton-endangerment convictions, and therefore dissent in part. Simply stated, the evidence was insufficient to establish that any of the three shots fired by Hall exposed the four Tackett children to a substantial risk of harm.

As was the case in *Swan v. Commonwealth*, 384 S.W.3d 77 (Ky.2012), the offenses alleged to have been committed against the Tackett children do not fit within the typical examples of first-degree wanton endangerment. The evidence here proved only that the children were located somewhere in the Tacketts' house at the time of the shootings, and in any event, it demonstrated that the children were not in the immediate vicinity of the fired shots. *Compare id.* at 103, *with Combs v. Commonwealth*, 652 S.W.2d 859, 860 (Ky.1983) (first-degree wanton endangerment included firing gun "right beside" a victim, "point blank" at another, and within 15 feet of another); *see also Swan*, 384 S.W.3d at 102–03 (proof that defendants fired guns "near" other victims in plain view provided ample support for first-degree convictions related to those victims). Nor did Hall fire indiscriminately into the occupied house; instead, he fired three shots with precision directly at his targets.

Again, the proof here demonstrated only that the children were inside the house at the time of the shootings. The Common-wealth argues, and the majority agrees, that since Alan was shot while standing in his doorway (when he was actually standing just beyond his doorway, holding the door open), the children could have been shot by a bullet exiting the body and traveling into the house or by an errant bullet if Hall's aim had been untrue, and thus they were endangered. But no evidence showed the locations of the children within the house at the time of the shootings, and there was no evidence that any of the three bullets were fired in the direction of any of the children. Nor was there any ballistics evidence put forth to show how or where the bullets could have traveled through the house. It was the Commonwealth's burden to offer proof of these facts, which were essential to show whether the children had actually been endangered.

The majority places great emphasis on its finding that Hall used "an incredibly powerful firearm," *ante* at 829, to kill Alan Tackett to support its assumption (without requiring proof) that the rifle's rounds were thus capable of traveling through any intermediate material that might have crossed their paths had Hall's aim not been so deadly. And having so assumed, the majority posits that any person located anywhere inside the house was substantially endangered by merely firing at a target standing in front of the house. This cannot be correct.

The only proof introduced by the Commonwealth that was even marginally probative to establishing the children's locations at the time of the shootings is the open-line 911 call. But this audio recording, by itself, does not prove that the children were in fact in close proximity to the shootings. With its glaringly obvious problems, this recording at best shows that some of the children were somewhere

in the general vicinity of the crime scene at some unknown (but presumptively short) time after the shootings occurred. No gunshots are heard on the recording, and neither Lisa's nor Alan's voice can be heard. Assuming the cordless phone found under Alan's leg was used to place the open-line call (although there was no actual proof introduced that it was), it is still impossible to discern the actual location of the children (or child) that can be heard screaming and crying in the background; at most, the recording proves they were within "earshot" of the telephone's microphone, however near or far that may have been. And it is impossible to determine the identities of the children (or child) that can be heard on the recording, or whether the crying was by one child or more; thus, the call fails to prove even that all four children were in the general vicinity after the shootings had already taken place. It certainly does not prove that all four children were in close proximity to the shootings when they occurred. Simply put, the open-line 911 call says next to nothing about where the children were actually located at the time the three shots were fired by Hall.

Nevertheless, the majority finds that this evidence supports a reasonable inference that the children were close by at the time of the shooting. At most, however, the evidence demonstrated that at least one child was near enough to Alan Tackett's body (assuming, again without direct evidence, that it was he who made the call) to be heard crying on the phone a very short time after the shootings. Even assuming that Alan Tackett was the dialer, a jury could only *speculate* as to how close the children had to have been to the telephone for their cries to be heard, and exactly which of their voices are audible on the recording and therefore within that distance. This simply is not sufficient to reasonably establish the proximity of any individual child, much less all four, to the shootings.

To support its conclusion, the majority relies on *Paulley v. Commonwealth*, 323 S.W.3d 715 (Ky.2010). In that case, the Court held that the trial court's erroneous failure to strike a juror required vacating the convictions of both Paulley and his co-defendant Gunn, and remanded for a new trial. *Id.* at 718. But relevant for this case, the Court further held that Gunn was not entitled to a directed verdict of acquittal on nine counts of wanton endangerment, which had been based on his firing a shotgun through the closed front door of a house occupied by nine people. *Id.* at 724. Gunn had argued only that a single shot could not support multiple wanton-endangerment counts. This Court disagreed, concluding that a single shot could be found to have endangered multiple people and thus support multiple convictions for wanton endangerment. *Id.* Though not expressly stated, this is because wanton endangerment, like homicide and assault, is a result crime, that is, one that criminalizes a result, rather than just an act. The forbidden result is substantial danger of death or serious physical injury, and each instance of that forbidden result gives rise to a separate offense.

The reasoning underlying the majority's application of *Paulley*'s holding to the present case is this: because *Paulley* presented similar facts (the firing of a "long gun," *ante* at 830, into or at [20] an occupied

---

**20.** The majority argues that "the evidence established that Hall *was* firing 'into an occupied house.'" *Ante* at 830. This is incorrect. It is undisputed that Hall *fired in the direction of* an occupied house when he shot Alan Tack-

ett, who was standing on his front porch outside the doorway into his house. We know that he was standing beyond the doorway when the shots were fired because his body was ultimately found half in and half out

house) and upheld the wanton-endangerment convictions, the convictions in this case must also be upheld. But the mere fact that it involved a scenario not unlike the present case does not mean it controls the outcome of this case. Significantly, it does not appear that the parties in *Paulley* even raised (and, in any event, the Court did not address) the particular issue raised here: whether the shots fired actually *created a substantial danger* of harm. Instead, the Court in that case addressed only whether a single shot could endanger multiple people. *Paulley*'s holding in this respect is correct, but it is limited in scope.

To be sure, the *Paulley* decision did not discuss what other proof there was in the case. Indeed, as the majority points out, *Paulley* did not consider the location of the nine occupants of the house in affirming the denial of the directed verdict. More importantly, *Paulley* did not even address that fact or its importance. Whether the occupants were actually endangered—a question that turns on many facts, including the victims' locations and the type of act creating the danger—was simply not addressed in *Paulley*.

Although the majority emphasizes our ruling in *Paulley* that "Gunn was properly charged with wanton endangerment as to each person who was inside Stone's home when Gunn fired into it," *id.* it is clear that *Paulley* simply considered a different issue than that presented in this case. The failure to consider this specific issue in that case was not an implicit affirmation of the lower court on that issue.

Moreover, to read *Paulley* as applying a broad rule that every firing of a gun into

(or toward) an occupied house constitutes wanton endangerment, as the majority suggests, would make it an outlier decision, especially when compared to *Swan*, which specifically addressed location questions. More importantly, and unfortunately, it would shift the burden of proof to the defendant to show that, in fact, the alleged victims were never endangered because they were, for example, well out of the line of fire or were behind brick or stone walls that even a high-powered rifle round could not pierce. But the burden of proof in showing a substantial danger is on the Commonwealth; the defendant is not required to negate an assumed danger of harm.

The analysis here boils down to resolving one question: Did the Commonwealth present sufficient evidence for a reasonable juror to conclude beyond a reasonable doubt that Hall's wanton behavior created a *substantial* risk of harm to the Tackett children? The proof shows at best that Hall's wanton conduct may have created *some* risk of danger to the children, which is insufficient to find him guilty of the four counts of first-degree wanton endangerment. To sustain a conviction, the statute requires Hall to have created a "substantial danger" of killing or seriously injuring each child. *See* KRS 508.060(1).

Even drawing all reasonable inferences in favor of the Commonwealth, it is clear that the Commonwealth did not present sufficient evidence for a jury to reasonably find that each Tackett child had been subjected to a *substantial* danger of being shot. The Commonwealth's main proof on this point, the crying on the 911 tape, does

---

of the house, with the threshold at approximately his waist. For him to have fallen back and ended up in this position, he had to have been beyond the doorframe. Thus, it is clear that no shots were fired into the house. And while one of the bullets ultimately ended up

inside the house, that was only by virtue of it having become lodged in the victim's head, after which he fell back into the doorway. Firing toward a house is not the same as firing into it.

not show which child or children were in the vicinity to be picked up on the phone microphone after the shooting or where they were located at the time of the shooting itself. And in addition to failing to prove the location of the children within the house or their proximity to the trajectory of the fired shots, the Commonwealth offered no proof of the .30–06 rounds' ability to ricochet off or pass through certain objects or materials, such as the floors or walls of the Tackett home.

Nevertheless, the majority treats the children's actual location within the house as wholly irrelevant, necessarily relying instead on the assumption that the rifle rounds had the capacity (if not probability) to reach every corner of the residence. Although " '[i]t is self-evident that bullets may ricochet,' . . . the danger from ricochets is not endless." *Swan,* 384 S.W.3d at 103 (quoting *Hunt v. Commonwealth,* 304 S.W.3d 15, 38 (Ky.2009)). It is simply improper to allow these general characteristics to be applied without limit and without regard for the specific characteristics of the projectile fired and the walls and other objects in the house that it may have had to travel through or ricochet off. As evidenced by the photographs admitted into evidence, there was a brick wall immediately behind the victim. Yet there was no proof that the bullets in question could pass through such a wall, nor was there proof that the children were in the immediate vicinity of the fired shots and not on the other side of that wall (or still other walls, or upstairs).

I cannot endorse the majority's presumption of substantial danger to all occupants of a building at which a bullet is fired without requiring some proof of the location of each occupant in relation to the projectile and the risk thus created to that occupant, or alternatively expert proof that the projectiles presented a substantial danger to all occupants of the house regardless of their location.

That said, the Commonwealth could have met its evidentiary burden fairly easily. For example, testimony about the children's location in the house from one of the older children, perhaps combined with testimony from someone like a police officer with knowledge and experience of the capacity of .30–06 bullets to ricochet and pass through solid objects, would likely have sufficed. But to allow the jury to reach its wanton-endangerment verdict based only on so-called common knowledge of ricochets and such—much of which is no doubt informed by popular (and inaccurate, if not outright fantastical) depictions of such events in popular media, rather than real-life experience—invites a verdict based on speculation.

And it is clear that the majority's position does just that. It allows the jury to engage in outright speculation as to what danger, if any, to the Tackett children Hall created when he aimed and fired his rifle in the direction of the house. Indeed, the majority would allow the jury to "infer" (read, *speculate* ) not only that there was a *possibility* that one of the rounds fired *could have* struck each child in the house, but that there was a *substantial probability* of this happening, as required to sustain the convictions. *See* KRS 508.060(1).

As this Court said in *Swan,* "[w]e must draw the line somewhere," 384 S.W.3d at 103, and the evidence in this case falls short of that line. Without proof showing, for example, that the shots were fired in the immediate vicinity of the children or in their actual direction, no reasonable juror could find beyond a reasonable doubt that any child, much less each child, was subjected to a substantial danger solely by virtue of having been located somewhere inside the residence in front of which their parents were shot.

Consequently, I would reverse Hall's four wanton-endangerment convictions because he was entitled to directed verdicts of acquittal on those counts, which would not be subject to retrial on remand.

Venters, J., joins.