RENDERED: FEBRUARY 20, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

**FINAL**

2019-SC-000024-MR

DATE 3/12/20

ROBERT HELTON             APPELLANT

V.

ON APPEAL FROM RUSSELL CIRCUIT COURT
HONORABLE VERNON MINIARD, JR., JUDGE
NO. 14-CR-00055

COMMONWEALTH OF KENTUCKY             APPELLEE

## OPINION OF THE COURT BY JUSTICE KELLER

### AFFIRMING

A Russell County jury found Robert Helton guilty of five counts of possession of matter portraying a sexual performance by a minor and five counts of distribution of matter portraying a sexual performance by a minor. The jury recommended a sentence of four years of imprisonment for each charge, to run consecutively, for a total recommended sentence of forty years of imprisonment. The trial court reduced the recommended sentence to twenty years of imprisonment, the statutory maximum. This appeal followed as a matter of right. *See* Ky. Const. Section 110(2)(b). Having reviewed the record and the arguments of the parties, we affirm the judgment of the Russell Circuit Court.

# I.   BACKGROUND

In 2008, the Cyber Crimes Branch of the Office of the Attorney General began investigations to identify persons using peer-to-peer programs[1] to receive and distribute child pornography. To do so, the investigators turned to a law enforcement database containing the findings of law enforcement agencies around the world. The database includes information on files known to contain child pornography, including any file names associated with a file, as well as the file's hash value, also referred to as a secure hash algorithm ("SHA") value. This SHA value acts as a "digital fingerprint" or "digital DNA" for that specific file, and therefore aids in the identification of child pornography files even if the file name has been changed.

An investigator with the Cyber Crimes Branch first queries the law enforcement database to see if there are any active Internet Protocol ("IP") addresses[2] geographically located in Kentucky possessing any of the known child pornography files. Once an IP address is identified, the investigator can determine how many files of known child pornography are potentially connected to that IP address. The investigator then runs automated software in an attempt to achieve a peer-to-peer download from the IP address. At that point, the investigator can view the suspected files to confirm that they contain child pornography.

---

[1] Peer-to-peer file sharing, often referred to as P2P file sharing, allows files to be transferred between individual computers. Common P2P programs include Limewire and Ares.

[2] An IP address is a series of numbers and periods used to identify computers or other devices that have access to the Internet.

Through this process, Kathryn Reed, an investigator with the Cyber Crimes Branch, identified an IP address suspected of searching or sharing child pornography. She identified the IP address on December 3, 2013 and began running her automated software. By December 4, 2013, her first download from that IP address was complete. Reed viewed the video file and determined that it contained child pornography. Over the next few days, Reed downloaded four more video files, each of which she determined contained child pornography. On December 13, 2013, she determined that Helton was the Internet service subscriber of that IP address. Based on this information, Reed and her team obtained a search warrant for Helton's home. A search was conducted on March 10, 2014, and seven items were seized, including a desktop computer, two laptop computers, three cell phones, and ten CDs or DVDs. Helton was subsequently arrested. Later, a forensic examination of the seized items revealed eighty-eight additional videos and three images of child pornography located on the desktop and a DVD containing three images of child pornography. Both the desktop and the DVD had been seized from a spare room located across from the master bedroom.

At the time of his arrest, Helton lived with two other adults, his wife and his wife's uncle, Neil Bernard.[3] Bernard lived in the basement of the home and had lived there "about a year," according to Mrs. Helton. At his trial, Helton attempted to shift the blame to Bernard, who he claimed had access to the

---

[3] At trial, Mrs. Helton explained that she often referred to Neil Bernard as her brother because they had been raised together, but he is technically an uncle.

computer, which was not password-locked. A Russell County jury ultimately found Helton guilty of five counts of possession of matter portraying a sexual performance by a minor and five counts of distribution of matter portraying a sexual performance by a minor. The jury recommended a total sentence of forty years of imprisonment, which was reduced to the statutory maximum of twenty years. This appeal followed.

## II. ANALYSIS

Helton asserts the following errors on appeal: (1) the trial court abused its discretion in denying Helton's request for a stipulation regarding the existence of the child pornography and permitting the introduction of portions of five videos containing child pornography; (2) the trial court abused its discretion in allowing testimony about eighty-eight additional child pornography videos and a DVD containing child pornography; and (3) Helton's due process rights were violated during the penalty phase when the jury heard incorrect testimony regarding his parole eligibility. We address each of these arguments in turn.

### A. The trial court did not abuse its discretion in permitting the Commonwealth to admit portions of the five videos containing child pornography.

Helton first argues that the trial court abused its discretion when it denied his request for a stipulation and instead allowed the Commonwealth to admit portions of the five child pornography videos downloaded from Helton's desktop computer. Essentially, he argues that the probative value of the evidence was substantially outweighed by the danger of undue prejudice, and

4

as a result, the trial judge should have prohibited the Commonwealth from playing the videos under Kentucky Rule of Evidence ("KRE") 403. For the reasons set forth below, we disagree.

Under KRE 401, relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under KRE 402, "[a]ll relevant evidence is admissible" unless otherwise excluded by the law or our rules of evidence. "Evidence which is not relevant is not admissible." KRE 401. However, under KRE 403, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Unduly prejudicial evidence has been defined as evidence that "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." *Richmond v. Commonwealth*, 534 S.W.3d 228, 232 (Ky. 2017) (quoting *Butler v. Commonwealth*, 367 S.W.3d 609, 615 (Ky. App. 2012)) (internal quotation marks omitted). When making such evidentiary rulings, a trial judge has broad discretion. *Daugherty v. Commonwealth*, 467 S.W.3d 222, 231 (Ky. 2015). Thus, this Court will not overturn a trial judge's decision to admit evidence absent an abuse of discretion. *Partin v. Commonwealth*, 918 S.W.2d

219, 222 (Ky. 1996), *overruled on other grounds by Chestnut v. Commonwealth*, 250 S.W.3d 288 (Ky. 2008).

In this case, the trial court conducted an in-chambers hearing on the first day of trial, prior to voir dire, to address defense counsel's motions, including a motion to prohibit the Commonwealth from playing the five videos. Defense counsel argued that it was unnecessary to show the videos because the only issue was *who* accessed the videos, not what the videos contained. The Commonwealth, on the other hand, argued that the videos were the best evidence available to demonstrate the elements of the charged offenses. The parties agreed, however, that the trial court needed to view the videos prior to conducting a KRE 403 balancing test. The Commonwealth then called Reed, the lead investigator, into chambers. She pulled up the videos on a laptop and played each one for the trial judge. The judge watched the three briefest videos in full and watched portions of the two longer videos, stopping only after Reed confirmed that the remainder of those videos reflected more of the same content.

After watching the videos, the trial judge ruled that the videos should be played for the jury to show "what [they are]," but held that the videos did not need to be shown in full. After the point of sexual contact, the judge explained, the videos were "too graphic" and would be "overwhelming" to the jury. Later, during trial, the trial judge repeated this direction to counsel on at least two occasions, firmly instructing the Commonwealth to show only the briefest portion of the videos possible to establish the necessary elements.

6

The videos were introduced on the second day of trial, during Reed's testimony. Before the Commonwealth played the videos, the trial judge explained to the jury that they were about to see graphic videos, but only a small portion of each video would be played "to avoid repetition and cumulative use" of the graphic videos. A small portion of each video was then played for the jury, followed by Reed's description of the remainder of the video. Because the content and length of the videos is important to our analysis, we briefly describe the excerpts shown to the jury:

- Video 1: This video, in total, is five minutes and thirty seconds long. The jury viewed approximately nine seconds of this video. In that nine-second portion, a nude preteen female (approximately six to nine years old) is dancing while an adult male inserts his finger into the girl's vagina.

- Video 2: This video is one minute and five seconds long. The jury viewed approximately three to four seconds of this video. In that excerpt, a young female child (three to four years old) is seen standing in front of a partially nude adult male, and the child masturbates the male's erect penis.

- Video 3: This video is one minute and eight seconds long. The jury viewed approximately three seconds of this video. In that excerpt, the same child from Video 2 is seen standing in front of a partially nude adult male. The child masturbates the male's erect penis. During her testimony, Reed clarified that Video 2 and Video 3 are not duplicates; they are clips from different video files.

7

- Video 4: This video is seven seconds long. The jury viewed approximately one second of this video. In that excerpt, an adult male penis is seen penetrating the anus of a nude toddler (two to four years old).

- Video 5: This video is fifteen seconds long. The jury viewed two to three seconds of this video. In that excerpt, an adult male penis is seen penetrating the anus of a toddler.

Helton now argues that the only issue at trial was whether he or another adult in the home downloaded the pornographic videos; he did not contest that the videos contained child pornography. Thus, he argues, there was little probative value in showing the videos to the jury. Helton also points to other evidence that tended to reveal the content of the videos, such as the prosecutor's brief descriptions during his opening statement, Reed's more detailed descriptions during her testimony, and the SHA values and file names of the videos.[4] He also refers to an offer by defense counsel to stipulate that the videos contained child pornography. He then cites to *Hall v. Commonwealth*, 468 S.W.3d 814 (Ky. 2015) for the proposition that "[w]hen there is already overwhelming evidence tending to prove a particular fact, any additional evidence introduced to prove the same fact necessarily has lower probative worth, regardless of how much persuasive force it might otherwise have by itself." *Id.* at 824. In sum, Helton argues that the probative value of the videos

---

[4] For example, one file was titled "hussyfanPTHC_colombia_girl_sexo_infantil_desfloration.avi." Reed testified that "hussyfan" is a "brand" of child pornography and "PTHC" generally refers to "preteen hardcore" pornography. Another file was titled "toddlerbeingfuckedbyman78678(2).mpg."

was significantly reduced by his offer to stipulate and the other available evidence, and the videos' prejudicial value therefore outweighed any probative value under KRE 403.

In response, the Commonwealth cites to two Kentucky Supreme Court cases, *Payne v. Commonwealth*, 623 S.W.2d 867 (Ky. 1981) and *Little v. Commonwealth*, 272 S.W.3d 180 (Ky. 2008). In *Payne*, the defendant was charged with, among other things, twenty counts of using a minor in a sexual performance. Those counts stemmed from the defendant's video-taping and photographing of juveniles engaged in sexual conduct. The Commonwealth was permitted to introduce one videotape and twenty photographs into evidence, over Payne's objection and offer to stipulate as to the acts shown on the tape. This Court held that this evidence was relevant to show design or pattern, and that probative value was not substantially outweighed by the threat of unfair prejudice. 623 S.W.2d at 877–78.

In *Little*, the defendant was charged with two counts each of using a minor in a sexual performance and promoting a sexual performance by a minor. These charges arose from three pornographic videos of Little's minor children and the minor daughter of another adult male. Both Little and the other adult male appear in the videos. At trial, all three videos were introduced in their entirety. This Court held that the videos were relevant to show Little's intent, which could be inferred from his actions in the videos, and to rebut his defense that the videos were for "family purposes." Though the videos were

9

"disturbing and repulsive," we held that they were not unduly prejudicial. 272 S.W.3d at 187.

In the present case, Helton was not accused of being a participant in or creator of the videos; he was charged only with possessing and distributing the materials. The present matter is therefore distinguishable from *Payne* and *Little*. However, both cases emphasize the importance of the KRE 403 balancing test. More specifically, both cases demonstrate that the probative value of child pornography images can outweigh the danger of undue prejudice, depending on the unique facts of the case.

In addition, one unpublished Kentucky Court of Appeals case presents a similar set of facts and a similar KRE 403 issue. In *Purdom v. Commonwealth*, No. 2014-CA-002079-MR, 2016 WL 2586080 (Ky. App. April 22, 2016), the defendant faced charges of possession and distribution of matter portraying a sexual performance by a minor. Portions of the child pornography videos were shown to the jury, and, like Helton, the defendant challenged the admission of this evidence on appeal. In its analysis, the Court of Appeals distinguished Purdom's case from *Hall*, in which this Court reversed a murder conviction after finding that the admission of twenty-eight graphic crime scene photos was "needlessly cumulative and often duplicative in nature" and served no other purpose than to "elicit unduly prejudicial emotional responses from the jurors." *Purdom*, 2016 WL 2586080 at *4 (quoting *Hall*, 468 S.W.3d at 827). Unlike the cumulative photographs in *Hall*, the videos in *Purdom* were each "different in content, established a separate charge, and the Commonwealth had refined the

10

portion of each video shown to the bare minimum." *Id.* However, the *Purdom* court did not expressly rule on whether the probative value of the videos outweighed their potential for undue prejudice; instead, the court reversed because the trial judge failed to view the videos prior to conducting the KRE 403 analysis.

Though our Kentucky case law provides limited guidance on this exact issue, many other jurisdictions have been faced with questions like the one before us today. For example, Helton cites to *United States v. Merino-Balderrama*, 146 F.3d 758 (9th Cir. 1998). In that case, a briefcase containing child pornography was seized from the trunk of the defendant's car. Among other things, the briefcase contained seven child pornography films, each with a cover bearing photographs of naked children engaged in sexual conduct. At trial, the jury viewed several minutes from each video. On appeal, the United States Court of Appeals for the Ninth Circuit reversed, noting that there was no direct or circumstantial evidence that the defendant had viewed the films, and the box covers were therefore more probative of scienter than the films themselves. Helton cites to this case to support his argument that "evidentiary alternatives" depicting the nature and content of the videos were available and therefore, the videos themselves did not need to be played for the jury.

However, since *Merino-Balderrama*, federal courts have repeatedly held that images or videos of child pornography were admissible under the federal version of KRE 403, even when such "evidentiary alternatives" existed. In fact, in *United States v. Cunningham*, 694 F.3d 372 (3d Cir. 2012), the Third Circuit

11

observed that "courts are in near-uniform agreement that the admission of child pornography images or videos is appropriate, even where the defendant has stipulated, or offered to stipulate, that those images or videos contained child pornography." *Id.* at 391 (citing *United States v. Polouizzi*, 564 F.3d 142, 153 (2d Cir.2009); *United States v. Schene*, 543 F.3d 627, 643 (10th Cir. 2008); *United States v. Ganoe*, 538 F.3d 1117, 1123–24 (9th Cir. 2008); *United States v. Morales–Aldahondo*, 524 F.3d 115, 120 (1st Cir. 2008); *United States v. Sewell*, 457 F.3d 841, 844 (8th Cir. 2006); *United States v. Dodds*, 347 F.3d 893, 898–99 (11th Cir. 2003)).

With these principles in mind, we consider the probative value of the five child pornography videos. On this point, we first note that the record does *not* contain an offer of stipulation. Rather, defense counsel repeatedly argued that the content of the videos was not at issue and, instead, the only issue for trial was *who* downloaded the videos. When defense counsel made this argument during the in-chambers hearing on the first day of trial, the prosecutor responded, "Defense counsel is not allowed to stipulate away the Commonwealth's case." There was no actual offer to stipulate in the record, however, nor does the record reflect that defense counsel made such an offer during trial. Regardless, even if we were to view defense counsel's arguments at trial as an offer to stipulate, we could not agree with Helton's argument that the trial court erred in denying that request for a stipulation. A trial judge does not accept or deny one party's offer to stipulate. Rather, a stipulation must be reached between the *parties*, not one party and the trial judge.

Furthermore, the Commonwealth is not obligated to accept an offer of stipulation just because it has been presented. Rather,

> [t]his Court has repeatedly held that "a stipulation offer cannot provide the foundation for a KRE 403 argument on appeal" because "the prosecution is permitted to prove its case by competent evidence of its own choosing, and the defendant may not stipulate away the parts of the case that he does not want the jury to see."

*Pollini v. Commonwealth*, 172 S.W.3d 418, 424 (Ky. 2005) (quoting *Johnson v. Commonwealth*, 105 S.W.3d 430, 438–39 (Ky. 2003) (quoting *Barnett v. Commonwealth*, 979 S.W.2d 98, 103 (Ky. 1998)); *see also Payne*, 623 S.W.2d at 877 ("This court knows of no rule or principle of law that requires the Commonwealth's Attorney to try his case by stipulation."). Thus, even if Helton's arguments at trial could be viewed as an offer to stipulate to the content of the videos, the Commonwealth was still entitled to present relevant evidence of its choosing, including the videos. As always, the Commonwealth's evidence remains subject to KRE 403.

In this case, because there was no stipulation as to the content of the videos, the videos themselves were highly probative of the fact that they did, in fact, contain child pornography. Obviously, this is a necessary element of the charges of possession and distribution of matter portraying a sexual performance by a minor. The fact that some, but not all, of the video file names suggested that those videos contained child pornography does not destroy that probative value. For example, Reed testified that, while file names are generally indicative of the content of the videos, she and her team of investigators must view the images to confirm that they do contain child pornography. Thus, while

13

the name on a file *may* be descriptive of the file's content, it is not necessarily so. As a result, the file names do not lower the probative value of the contents of the files enough to limit the admission of those videos.

Furthermore, while a law enforcement agent may flag a file as child pornography and enter that file's SHA value into the law enforcement database, the SHA value is not conclusive proof that the file contains child pornography. The question of whether the file actually contains child pornography remains a factual question for the jury to resolve. In other words, while a SHA value may somewhat reduce the probative value of the images themselves, it cannot and does not take the ultimate decision of whether the files contain child pornography away from the jury. Lastly, we note that, while Reed also testified about the content of the films,[5] including a vivid description, the images themselves contained the *actual* evidence of the child pornography.

While the very nature of child pornography videos renders them inherently prejudicial, the danger of undue prejudice did not outweigh the probative value of the videos in this case. Each video contained a different video file, which established a separate charge. The trial judge directed the Commonwealth to limit the excerpts shown to the jury to the bare minimum necessary to establish the elements of those charges, and the Commonwealth did so, showing mere seconds of each video. In fact, the longest video shown to

---

[5] To the extent Helton argues that the prosecutor's descriptions of the videos in his opening statements constituted an "evidentiary alternative" to showing the videos, we note that an attorney's statements during an opening statement or closing argument are *not* evidence.

14

the jury was only nine seconds in length, and the jury saw, at most, a total of twenty seconds of video. As the trial judge noted, these limitations reduced the cumulative effect of the images and minimized their potential for undue prejudice.

Under these circumstances, we hold that the trial judge did not abuse his discretion in permitting the Commonwealth to introduce the limited portions of the five videos.

### B. The trial court did not abuse its discretion in allowing limited testimony about eighty-eight child pornography videos and a DVD containing images of child pornography.

In addition to the five videos giving rise to the charges against Helton, eighty-eight other videos containing child pornography were discovered on the desktop computer, and a DVD containing three images of child pornography was found in the same room where the desktop was located. These materials were referenced during the testimony of Thomas Bell, the forensic examiner. Helton argues that this testimony of other bad acts—namely, downloading child pornography—was admitted in violation of KRE 404(b). We disagree.

Under KRE 404(b), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence may be admissible, however, "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." KRE 404(b)(1). It may also be admissible if it is "so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be

15

accomplished without serious adverse effect on the offering party." KRE 404(b)(2). When considering whether such other bad acts evidence should be admitted, the court must (1) determine whether the evidence is relevant for some purpose other than proving the criminal disposition of the defendant; (2) determine whether the act "is sufficiently probative of its commission to warrant its introduction into evidence"; and (3) balance the probative value of the prior bad acts evidence against the potential for undue prejudice. *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994). On appeal, we review the trial court's decision to admit such evidence for an abuse of discretion. *Harp v. Commonwealth.*, 266 S.W.3d 813, 922 (Ky. 2008).

In the present case, the Commonwealth filed a "404(b) Notice" approximately three months prior to trial. The notice announced the Commonwealth's intent to introduce evidence of Helton's other bad acts, including (1) that Helton "searched, shared and downloaded child pornography images and videos in the past"; (2) that Helton "had software on his computer used for searching, sharing and downloading child pornography"; and (3) "all parts of the Digital Forensics Report" compiled by Bell. In the notice, the Commonwealth stated that this evidence would be "offered to show absence of mistake, proof of motive, modus operandi, intent, plan and knowledge."

Defense counsel did not file a formal objection to the Commonwealth's notice. However, during the in-chambers hearing on the first day of trial, defense counsel objected to discussing any images other than those five videos giving rise to the charges in this case, arguing that any other child

16

pornography images constituted improper character evidence under KRE 404(b) and were highly prejudicial. The Commonwealth argued that the additional images tended to prove knowledge, intent, and the absence of mistake and were therefore admissible under the rule. The Commonwealth also explained that it would only elicit testimony about the materials; it would not actually introduce those images into evidence. The trial court held that, under those circumstances, the Commonwealth could elicit testimony about the additional images so long as a limiting instruction was provided.

At trial, Bell testified during the Commonwealth's case-in-chief. He testified that a total of ninety-three "contraband" videos (the five initial videos plus an additional eighty-eight videos) and three images[6] had been found on the "My Shared Folder" of the desktop computer. Bell then began to testify about child sexual abuse ("CSA") hash matches. At this point, defense counsel objected, again arguing that references to the additional child pornography materials and their CSA hash matches violated KRE 404(b). Defense counsel asked that the judge prohibit any further testimony about these additional materials and provide a limiting admonition. After some consideration, the judge ultimately reversed his previous ruling and disallowed the testimony about any additional videos or images unless the Commonwealth could prove

---

[6] The three images found on the desktop computer are not at issue in this appeal. In his appeal, Helton argues only that the trial judge erred in allowing testimony about the eighty-eight additional videos and the three DVD images discussed below.

that the materials were downloaded prior to Neil Bernard's arrival in the Helton home, as this fact would link the images to Helton and tend to prove identity.

The Commonwealth then explained to the trial judge that a DVD containing three child pornography images had also been found in the Helton home. The Commonwealth stated that the DVD had been created in 2005, several years before Bernard moved into the home, but it could not be shown that the eighty-eight videos or images were downloaded prior to Bernard's arrival.[7] The judge permitted the prosecution to ask about any materials pre-dating Bernard's arrival. Accordingly, when Bell's testimony resumed, the Commonwealth elicited testimony about the images on the DVD, but not the other videos or images.

When Bell began to discuss the DVD, defense counsel again objected on the grounds that this was improper KRE 404(b) evidence. In response, the Commonwealth again explained that the DVD pre-dated Bernard's arrival in the home, thereby rebutting the defense's argument that Bernard was responsible for the five video downloads. The judge agreed, and defense counsel requested an admonition. Bell then continued his testimony. He testified that he identified three child pornography images on the DVD, and these three images were created or downloaded in 2005. He did not testify further about the DVD images.

_____

[7] This was due largely to Mrs. Helton's conflicting statements about when Bernard moved into the house.

After Bell's testimony, the trial court admonished the jury to consider the evidence of the three DVD images for purposes of "plan, preparation, identity, opportunity, or intent, but for no other purpose." Both the Commonwealth and defense counsel had agreed to the language of the limiting admonition. Later, a limiting instruction was also provided to the jury, which stated, in full:

> As you were admonished before, the evidence presented in regard to the DVD and images thereon are [sic] not to be considered by you to show action in conformity therewith. It is only to be considered by you in your deliberations for [sic] to show opportunity, knowledge, preparation or identity.

Neither the admonition nor the instruction specifically addressed the eighty-eight videos or three images found on the desktop computer.

We first consider Helton's argument that the trial court abused its discretion in permitting Bell to testify about the eighty-eight additional videos found on the desktop computer. However, as noted above, when Bell began to reference these additional videos, defense counsel objected and requested an admonition. The trial court effectively sustained the objection, reversing its previous ruling and disallowing any additional testimony about the eighty-eight images unless it could be shown that they had been downloaded prior to Neil Bernard's arrival. After the objection was sustained, Bell did not provide any further testimony about the eighty-eight videos. The judge did not rule on defense counsel's request for an admonition, and defense counsel did not renew his request for an admonition about the eighty-eight videos. Because defense counsel's objection was sustained, and he did not seek a ruling on his request for a limiting admonition, we find any alleged error as to the failure to

give an admonition to be waived. *See Dillard v. Commonwealth*, 995 S.W.2d 366, 371 (Ky. 1999) (citations omitted).

We next consider whether the trial court abused its discretion in permitting Bell's limited testimony about the DVD images. We first hold that these additional images of child pornography were relevant to show identity, or in other words, to show who had access to the computer at the time of the downloads. In this case, Helton argued that Bernard downloaded the child pornography, so the fact that child pornography images had been downloaded prior to his arrival at the Helton home tended to rebut this defense. Accordingly, evidence of the DVD images was relevant for some purpose other than proving the criminal disposition of the defendant, thereby satisfying the first prong of *Bell v. Commonwealth*.

In addition, because the date of the DVD downloads tended to show that someone other than Bernard downloaded the DVD images, and there was no evidence that anyone other than Helton and his wife lived in the home in 2005, there was sufficient evidence that Helton downloaded the DVD images. Thus, that prior bad act was "sufficiently probative of its commission to warrant its introduction into evidence." *Bell*, 875 S.W.3d at 889. In other words, there is sufficient evidence that Helton committed the prior bad act of downloading the DVD images, thereby satisfying *Bell's* second prong.

*Bell's* final prong requires us to balance the probative value of the evidence against the danger of undue prejudice. On this point, we note that the prejudicial value of the testimony was minimal. Bell did not testify at length

about the DVD images. He testified only that three child pornography images were located on the DVD and these were created or downloaded in 2005. He did not describe the contents of the images, nor did the jury view the images. *See Williams v. Commonwealth*, 178 S.W.3d 491, 497 (Ky. 2005) (finding no error in the introduction of other pornographic images when jury was only informed about their existence).

Furthermore, the trial court provided a limiting admonition—and later, a limiting instruction—to the jury, directing them to consider the DVD images only for purposes of opportunity, knowledge, preparation, or identity. We presume that the jury followed the trial court's admonition and instruction and have no reason to believe that they did not do so. *Alexander v. Commonwealth*, 862 S.W.2d 856, 859 (Ky. 1993), *overruled on other grounds by Stringer v. Commonwealth*, 956 S.W.2d 883 (Ky. 1997).

Finally, we note that the Commonwealth only briefly referenced the DVD images in its closing argument. When the prosecutor mentioned the DVD, he reminded the jury that this evidence was not intended to show "action in conformity therewith," but rather, to identify the person who downloaded the five videos. Under these circumstances, we hold that the prejudicial value of Bell's limited testimony did not outweigh the probative value of that evidence.

Accordingly, the trial court did not abuse its discretion in allowing the brief and limited testimony about the additional child pornography images under KRE 404(b).

21

## C. The incorrect testimony regarding Helton's parole eligibility did not violate Helton's due process rights.

Helton next argues that the jury received incorrect testimony during the sentencing phase of his trial, thereby violating his due process rights. More specifically, he points to the testimony of Greg Cooper, a Probation and Parole Officer who testified on behalf of the Commonwealth. During his testimony, Cooper identified Helton's convictions as non-violent Class D felonies. He further explained that Helton could receive a sentence ranging from one to five years for each conviction. When asked about parole eligibility, he stated that Helton would have to serve at least fifteen percent of his sentence before he became eligible for parole.

Later, during cross examination, defense counsel asked Cooper about Class D felonies that have a greater parole eligibility requirement. Cooper responded that certain violent offenses might require a twenty-percent parole eligibility, but "not in [Helton's] case." Defense counsel began to question Cooper further, but the Commonwealth requested a bench conference. At the bench conference, the prosecutor explained his belief that neither offense (possession of matter portraying a sexual performance by a minor or distribution of matter portraying a sexual performance by a minor) was a violent crime qualifying for twenty-percent parole eligibility. Defense counsel's response is mostly unintelligible; however, it appears that his concerns were whether Helton would receive any meritorious good time credit on these offenses and whether he would be required to complete a sex offender treatment program before becoming eligible for parole. The trial judge permitted

22

defense counsel to address those concerns on cross examination. When cross continued, defense counsel stated to Cooper, "I think, as far as I understood, you were saying that the parole eligibility is fifteen percent?" and Cooper responded in the affirmative. Defense counsel then stated, "Okay, and that it is not one of those where they don't get jail credits for anything. In other words, if it, there are some offenses that are designated, but I don't think these are, so I'll, I'll agree, so it's just purely fifteen percent?" Cooper asked if counsel was referring to meritorious good time credit, and defense counsel responded, "Yes, yes."

Defense counsel then continued his line of questioning about meritorious good time credit and the sex offender treatment program. For example, the Probation and Parole Officer testified that Helton would be required to complete a sex offender treatment program before becoming eligible for parole. The officer testified that the program required its participants to admit guilt. While the officer did not know if a person would be removed from the program for failing to admit guilt, he did explain that a person who fails to complete the program may never be eligible for parole.

Neither the prosecutor nor defense counsel sought further clarification or correction of Cooper's testimony regarding the fifteen-percent parole eligibility. However, under KRS 439.340(3)(a),

> A nonviolent offender convicted of a Class D felony with an aggregate sentence of one (1) to five (5) years who is confined to a state penal institution or county jail shall have his or her case reviewed by the Parole Board after serving fifteen percent (15%) or two (2) months of the original sentence, whichever is longer.

23

Thus, Cooper's testimony was incorrect to the extent it failed to clarify that Helton would have a fifteen-percent parole eligibility only if his *aggregate* sentence was one to five years.

We have previously held that incorrect or false testimony violates due process if it is "material," which means there was a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Robinson v. Commonwealth*, 181 S.W.3d 30, 38 (Ky. 2005) (citations omitted). For example, in *McGregor v. Commonwealth*, No. 2012-SC-000245-MR, 2013 WL 4680444 (Ky. Aug. 29, 2013), a Probation and Parole Officer testified that the parole eligibility for first-degree wanton endangerment, a Class D felony, was fifteen percent, but she failed to inform the jury that the defendant's parole eligibility would be fifteen percent only if the aggregate sentence was one to five years. We found palpable error, noting that the Commonwealth had relied almost exclusively on the officer's testimony to persuade the jury to recommend the maximum sentence. We explained, "The jury was not given complete information regarding parole eligibility; here, there is a 'substantial possibility' that had the jury been presented with correct information regarding parole eligibility that Appellant would have gotten a lesser sentence." *Id.* at *7 (citation omitted).

Helton relies on *McGregor* and urges us to find palpable error in his case, as well. Here, however, we have no reason to believe that the jury would have recommended a lesser sentence if it had been presented with the correct parole eligibility information. Unlike the prosecutor in *McGregor*, the Commonwealth

24

did not rely exclusively on the incorrect testimony of the Probation and Parole Officer in its closing argument. Rather, he discussed sentencing matters (like the statutory maximum and the difference between consecutive and concurrent sentences) and then read descriptions of the child pornography videos that had previously been shown to the jury. After reading these descriptions, he urged the jury to impose the maximum possible sentence of twenty years. Nevertheless, the jury—despite hearing testimony and argument that the maximum possible sentence was twenty years—recommended a *forty* year sentence. This strongly suggests that the jury chose such a lengthy sentence based on the nature of the crimes, rather than any mistaken belief about Helton's parole eligibility. Furthermore, the jury heard testimony that Helton will *never* become eligible for parole if he fails to complete the required sex offender treatment program. Thus, it is unlikely that Helton's parole eligibility affected the jury's recommended sentence. We therefore decline to find palpable error in this case. We note, however, that parole eligibility information often plays a vital role in the sentencing phase of a criminal trial, and we take this opportunity to remind both the Commonwealth and the defense bar of its responsibility to present the correct parole eligibility information to the jury.

## III. CONCLUSION

For the reasons set forth above, the judgment of the Russell Circuit Court is hereby affirmed.

All sitting. All concur.

25

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Christopher Henry
Assistant Attorney General