# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.



# Supreme Court of Kentucky

## 2019-SC-000121-MR

CODY BATES                      APPELLANT/CROSS-APPELLEE

V.               ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE ANNIE O'CONNELL, JUDGE
NO. 17-CR-001730

COMMONWEALTH OF KENTUCKY        APPELLEE/CROSS-APPELLANT

AND

## 2019-SC-000141-MR

COMMONWEALTH OF KENTUCKY        APPELLANT/CROSS-APPELLEE

V.               ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE ANNIE O'CONNELL, JUDGE
NO. 17-CR-001730

CODY BATES                      APPELLEE/CROSS-APPELLANT

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

A Jefferson County Grand jury indicted Appellant, Cody Bates, of one count of murder for the death of three-month-old Prestyn Amato. A Jefferson Circuit Court jury convicted him of wanton murder and recommended a sentence of thirty-five years' imprisonment. Bates was sentenced in

1

accordance with the jury's recommendation, and now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

Bates asserts the trial court erred in admitting four of Prestyn's autopsy photographs. The Commonwealth, in a cross-appeal, asserts the trial court erred by excluding portions of Bates's statements to a co-worker and excluded portions of his confession. The Commonwealth sought review of these issues only if Bates's conviction was overturned and the case remanded for a new trial. Bates argues the Commonwealth could not file such a cross-appeal. We need not address either the issues the Commonwealth raises or the propriety of the cross-appeal, however, as we affirm the trial court and dismiss the Commonwealth's cross-appeal as moot.

## I. BACKGROUND

Cody Bates and Audryeonna Amato were involved in an on-and-off relationship for four years. In February 2017, during one of the "off" periods, Amato gave birth to Prestyn, a healthy baby boy. About a week after Prestyn's birth, Bates and Amato resumed their relationship, with Bates eventually moving into Amato's apartment with her and Prestyn. Paternity was never established; however, Bates assumed the role of Prestyn's father. Amato and Bates shared parental duties including getting up with the baby for feedings and diaper changes.

Bates and Amato both worked night shift during the week at their respective jobs and Amato's stepmother, Rita Amato, cared for Prestyn while the couple worked. On a typical workday, Amato would drop Prestyn off at

2

Rita's home on her way to work and then Bates would pick Prestyn back up in the early morning hours on his way back home.

On June 9, 2017, Bates picked Prestyn up from Rita's and he and the baby were back at the family apartment before 6:00 a.m. when Amato returned home from work. After arriving home, Amato checked on Prestyn a couple of times before she and Bates went to bed. According to Amato, Prestyn was sleeping soundly and breathing normally when she checked on him. At some point after Amato and Bates went to sleep, Prestyn stirred and Bates got up and took the baby into the living room to change his diaper and feed him. Before 8:00 a.m., Bates woke Amato telling her Prestyn had rolled off the couch and would not wake up. When Amato went to the couch where Prestyn was lying, the baby appeared to be asleep, but was breathing irregularly.

Bates called 911 and reported Prestyn had fallen and hit his head. When EMS arrived and performed CPR on the baby, they called for Advanced Life Support because Prestyn's heart had begun slowing. Prestyn had gone into cardiac arrest before being transported to the Norton's Children's Hospital emergency room. Medical personnel continued performing CPR while en route to the hospital; however, when Prestyn arrived at the emergency room, he had no pulse and was not breathing. At the hospital, doctors were unable to get a pulse and declared Prestyn deceased before 9:00 a.m.

Pursuant to a request from the Jefferson County Coroner's office, Norton Hospital completed X-rays and a CT scan of Prestyn. The tests revealed a skull fracture, three sub-scalp injuries, and a subdural hemorrhage with accompanying brain bleed. Later, Prestyn's autopsy revealed optic nerve

3

sheath damage not visible in the CT scan. These closed-head injuries were not externally visible.

The morning Prestyn died, Bates told Amato, the 911 dispatcher, and EMS personnel that Prestyn rolled off the couch and hit his head. After Prestyn died, Louisville Metro Police Detective Timothy O'Daniel interviewed Bates. Bates initially gave Detective O'Daniel the same account. In the recorded interview (conducted just hours after Prestyn's death), Bates began his account of the occurrences the morning in question by telling Detective O'Daniel that Prestyn had fallen off the couch and possibly hit his head on a wooden table as he fell. When Detective O'Daniel told Bates that a fall of that nature would not have caused Prestyn's skull fracture, Bates changed his story. In the new explanation of the baby's injuries, Bates told Detective O'Daniel he accidentally dropped Prestyn to the floor, tried to pick him up, and then Bates fell. When he fell, Bates said he threw Prestyn three to four feet toward the couch. Prestyn missed the couch, fell to the floor, and hit his head.

At trial, Bates denied throwing Prestyn toward the couch. Bates said when he got up with Prestyn, he tried to comfort him by walking and holding him. Bates claimed that while walking, his left leg gave out underneath him and caused him to fall. According to Bates's new version of events, he landed on top of Prestyn when he fell. Bates said that when he tried to put Prestyn on the couch after the fall, he dropped him and Prestyn hit his head on the floor.

At trial, Amato described Prestyn as a healthy three-month-old with only minor visible injuries including a "ding" on his forehead and a slight cut on his nose from his own fingernails. Dr. Katherine Nichols, the Norton Hospital

4

emergency room physician who treated Prestyn when he was brought in, noted in her report and testified at trial that she saw mild scabbing at the base of Prestyn's nose, a slight bruise to his forehead, and a chin abrasion. According to Dr. Jeffrey Springer, the medical examiner who performed Prestyn's autopsy, the externally-visible injuries described by Amato and Dr. Nichols did not cause Prestyn's death. Dr. Springer testified that the externally-visible injuries were related to Prestyn's medical treatment with exception of a slight, healing bruise on his forehead.

The Commonwealth sought to introduce two photos to show the minor injuries described by Amato and Dr. Nichols. The two photos, taken by Dr. Springer before the autopsy, are of the front and side of Prestyn's head. In reviewing these two photographs, we note they are not graphic or bloody and in both photos, Prestyn's eyes are closed. If someone did not know the photographs were from an autopsy in a child homicide case, the two pictures could be described as those of a sleeping infant's face.

The Commonwealth also sought to introduce two autopsy photos revealing three sub-scalp injuries. These two photos show the scalp pulled back from the skull, revealing three separate dark spots. Due to the nature of these fatal injuries (which were not externally visible), these photographs were graphic. Dr. Springer testified the dark spots seen in the two pictures were impact wounds. The two internal-injury photographs are unmistakably of an infant's head.

The Commonwealth indicates these four photographs were selected by the Commonwealth from among more than seventy autopsy pictures taken by Dr. Springer. The four photos do not show the optic nerve sheath damage. Dr.

Springer testified that there was no single photo depicting all the head injuries due to their disparate locations (with some injuries being external and others internal). Bates objected to the introduction of the four photos.

The Commonwealth sought to avoid any confusion between Amato's description of Prestyn's minor visible external injuries and internal injuries that proved fatal. When discussing the two external injury photos, the trial court specifically referenced Amato's testimony describing Prestyn's minor head injuries prior to his death. The trial court admitted the two external injury photographs.

The trial court took the Commonwealth's request to admit the two remaining photos under submission until Dr. Springer testified about Prestyn's internal injuries. The trial court expressed concern about the possible cumulative nature and prejudicial effect of the pictures. The trial court instructed the Commonwealth to obtain as much detail and explanation of the internal injuries as possible from Dr. Springer.

Dr. Springer described Prestyn's internal injuries as being the result of blunt force trauma to the infant's head. Based on the number and location of the injuries, Dr. Springer concluded that a fall from a couch, even if the child hit a table during the fall, would not account for the three sub-scalp injuries, the skull fracture, and the optic nerve sheath damage. Each of the internal injuries Dr. Springer described, reflected separate "strike" sites or points of impact. According to Dr. Springer, the skull fracture may have been another separate strike site unconnected to the three sub-scalp injuries; however, Dr. Springer could not conclusively make that determination. Dr. Springer

6

testified that it was possible that four distinct blows to the head caused Prestyn's internal fatal injuries.

Dr. Springer also testified the optic nerve sheath damage was consistent with sudden deceleration—meaning Prestyn's head was moving and came to an abrupt stop. Dr. Springer concluded that the internal injuries were consistent with the infant being thrown four or five feet, striking an object, and falling to the floor where he struck his head again.

During Dr. Springer's testimony, the Commonwealth renewed its motion for admission of the two autopsy photographs depicting Prestyn's fatal internal injuries. The Commonwealth argued that two photographs were not cumulative, but conceded that autopsy photos in general were gruesome— especially in a case involving a baby's death. At the bench conference, the Commonwealth asserted it had a high burden to meet and the two photos were necessary to show the location and extent of the injuries described by Dr. Springer. The Commonwealth argued the internal injuries were the cause of death and were not extraneous injuries unrelated to issues before the jury. Bates renewed his objection.

The trial court explained that because this was a murder case, Prestyn's dead body was a fact in the case, and autopsy photos were part of the evidence. Further, the trial court found that the Commonwealth's need to demonstrate the location and extent of the injuries described by Dr. Springer and shown in these two photographs was compelling. The trial court permitted two printed copies of the photographs to be circulated to the jury, but directed the two photos not be displayed on the large video screen on which other photos had been shown to the jury.

7

The trial court instructed the jury on theories of intentional murder, wanton murder, second-degree manslaughter, and reckless homicide. The jury found Bates guilty of wanton murder and recommended a sentence of thirty-five years' imprisonment. The trial court followed the jury's sentencing recommendation.

The Commonwealth filed a cross-appeal of a pretrial ruling excluding statements Bates allegedly made to a co-worker and parts of Bates's confession to Detective O'Daniel. As we are affirming Bates conviction, thus mooting the cross-appeal, we will not address the factual matters or legal arguments in the cross-appeal or Bates's contention that these issues are not properly before this Court.

## II. ANALYSIS

Bates alleges error when the trial court admitted the four autopsy photos described above—two of which displayed external head injuries and two internal. The four photographs were admitted in conjunction with the testimony of the medical examiner who conducted Prestyn's autopsy, Dr. Jeffrey Springer, and were selected by the Commonwealth from the seventy-nine pictures taken by Dr. Springer during the autopsy. During Dr. Springer's testimony, the photographs were used to demonstrate and explain the nature and location of Prestyn's injuries.

We review a trial court's evidentiary rulings for an abuse of discretion. *Woodard v. Commonwealth*, 147 S.W.3d 63, 67 (Ky. 2004). The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable,

unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

Bates claims the trial court should have excluded Prestyn's autopsy photographs pursuant to the KRE 403 balancing test. KRE 403 states: "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." "Like all evidence, [photographs] are subject to the balancing test of KRE 403." *Hall v. Commonwealth,* 468 S.W.3d 814, 823 (Ky. 2015). *Hall* provides significant guidance for analysis of claims involving graphic victim photographs.

This Court has said, "[w]e now make clear that in all cases in which visual media showing gruesome or repulsive depictions of victims are sought to be introduced over objection, as with all other types of evidence, the trial court must conduct the Rule 403 balancing test to determine the admissibility of the proffered evidence." *Id.* at 823. Bates argues that the four photographs at issue were improperly admitted and his conviction must be reversed. We disagree.

A trial court must conduct a three-part evaluation of objected-to evidence:

> (i) assessment of the probative worth of the evidence whose exclusion is sought; (ii) assessment of the probable impact of specified undesirable consequences likely to flow from its admission (i.e., "undue prejudice, confusion of the issues, or misleading the jury, ... undue delay, or needless presentation of cumulative evidence"); and (iii) a determination of whether the product of the second judgment (harmful effects from admission) exceeds the product of the first judgment (probative worth of

9

evidence).

*Webb v. Commonwealth*, 387 S.W.3d 319, 326 (Ky. 2012).

In the case at bar, the trial court conducted a review of Prestyn's autopsy photographs pursuant to KRE 403. As aforementioned, after determining the two external-injury photos were admissible, the trial court withheld ruling on the admissibility of the two internal-injury photographs due to concerns over their potential undue prejudice and cumulative effect. When the Commonwealth sought to introduce the photographs during Dr. Stringer's testimony, Bates claims the trial court's stated reasons for allowing the admission of the photographs are erroneously lacking requisite language.

Although the trial court did not recite exact language from the rule when conducting the review, that is not dispositive. This Court does not "require trial courts to make detailed written findings to support the many evidentiary rulings they must make in the course of a trial." *Cox v. Commonwealth*, 553 S.W.3d 808, 816 (Ky. 2018). Nor do we require that trial courts use exact language taken from the rule to explain decisions about admitting evidence. The record does, however, need to be clear that the trial court engaged in the required balancing. The record in this case is clear the trial court engaged in the required KRE 403 balancing.

In the present case, the trial court utilized a balancing of probative value versus prejudicial effect—beginning when the Commonwealth first tendered the four photographs for admission. The trial court carefully reviewed each individual photograph and asked questions concerning pictures both individually and collectively. The trial court listened to arguments of counsel and responded to those arguments. When ruling that the two photographs

10

depicting minor external injuries were admissible, the trial court referenced Amato's testimony concerning some minor head injuries Prestyn had prior to his death. As to the photographs showing Prestyn's fatal internal injuries, the trial court did not find their probative value outweighed their prejudicial effect until after the Commonwealth was able to adequately demonstrate that its need for the photographs' admission in order to show the location and nature of the injuries was essential.

In evaluating graphic photos, we have said, "[b]ecause the Commonwealth must prove the *corpus delicti*, such photographs are relevant to show the nature of the injuries inflicted by the defendant upon the victim." *Ernst v. Commonwealth*, 160 S.W.3d 744, 757 (Ky. 2005) *overruled on other grounds* by *Mason v. Commonwealth*, 559 S.W.3d 337 (Ky. 2018). Furthermore, "we have consistently held that the Commonwealth may 'prove its case by competent evidence of its own choosing, and the defendant may not stipulate away the parts of the case that he does not want the jury to see.'" *Hall*, 468 S.W.3d at 825 (quoting *Pollini v. Commonwealth*, 172 S.W.3d 418, 424 (Ky. 2005)).

In this case, Bates did not contest the descriptions of the external or internal injuries by Amato, Dr. Nichols, and Dr. Springer. Despite that lack of contest, albeit tacit acceptance, the Commonwealth offered a credible reason for admitting the photographs. Namely, the Commonwealth argued it needed the photographs to prove its case to jurors who may learn visually. The Commonwealth stated that some jurors might grasp the importance of the injuries, both fatal and non-fatal, from Dr. Springer's testimony. However, other jurors may be visual learners who require a different way to receive

11

critical information. Faced with a high burden of proof and with defense counsel's claim in opening statements that Bates was going to testify and offer a version of what happened more consistent with accident (or at least with a state of mind less than intentional), the Commonwealth's contention that it needed to reach every juror with its critical evidence was reasonable.

The trial court admitted the two photographs of external injuries prior to Dr. Springer testifying, noting Amato's testimony about the very minor injuries the child had prior to his fatal injuries. The external injuries Amato described, and those noted and described by Dr. Nichols, were not the cause of Prestyn's death according to Dr. Springer. The Commonwealth sought to prove the injuries inflicted by Bates caused Prestyn's death—and that included showing the jury that the minor external injuries were not severe. The two external-injury photos, as noted above, were not gruesome or graphic and the trial court did not abuse its discretion in finding they were not unduly prejudicial.

The trial court's decision to admit the two external-injury photographs before Dr. Springer testified and withhold ruling on the remaining two pictures until after hearing his testimony shows the trial court was aware of the possible undue prejudice and possible cumulative impact the photographs might have. The two sets of pictures are very different in their nature, in the injuries they present, and in the potential for prejudice.

The trial judge made the concerns she had with the pictures clear in withholding her decision to admit the two internal-injury photos. The trial judge said, "I am going to withhold my ruling on this. I do think this is highly—could—first of all, I think it is potentially cumulative, but also could really inflame the jury in a way that is more prejudicial than probative." These

12

words indicate the trial court's careful weighing of the probative value versus prejudicial effect of the pictures of Prestyn's internal injuries. The trial court instructed the Commonwealth to bring out as many details about the internal injuries as possible from the medical examiner.

During Dr. Springer's testimony, the Commonwealth sought to admit the two internal-injury photographs. Bates renewed his objections to the photographs. The Commonwealth argued that the injuries reflected in the photographs were the injuries associated with Prestyn's cause of death. The trial court ultimately accepted the Commonwealth's argument that it needed to show the jury the location and nature of the internal injuries. Although the trial court did not use specific words such as "the probative value exceeded the prejudicial effect," that is precisely what the trial court determined. The trial court's determination met the third and final prong of the test set out in *Webb*, 387 S.W.3d at 326. As a further example of the trial court's continued balancing of probative value versus prejudicial effect, the court ordered the Commonwealth to circulate the two photographs to the jury rather than presenting them on the large video display where all other photographic evidence during the trial had been presented.

Bates argues that in making the determination that the photographs were necessary to show the nature and location of the injuries, the trial court failed to give due regard to the other evidence admitted as required by *Hall*. In *Hall* we said

> Thus, in cases like Hall's, the trial judge cannot do a Rule 403 balancing for an individual photo in a vacuum. Instead, the judge must consider the photographs within the full evidentiary context of the case, giving due regard to other evidence admitted as well as evidentiary alternatives, so as to ascertain each item's "marginal"

13

or "incremental" probative worth for purposes of weighing that value against the risk of prejudice posed by the evidence. *See Norris v. Commonwealth,* 89 S.W.3d 411, 416 (Ky. 2002) ("[I]n exercising its discretion under Rule 403, a trial court must consider in the balancing test . . . other available evidence to prove the fact in issue."); *United States v. Beechum,* 582 F.2d 898, 914 (5th Cir. 1978) (holding "incremental" probative value, or what the evidence contributes to the persuasive force of other evidence on the same point, must be weighed against prejudice).

468 S.W.3d at 824.

In *Hall,* the trial court had admitted a graphic crime scene video, individual crime scene photographs showing the victims and their injuries from multiple angles including increasingly closer pictures of the injuries, and autopsy photos. The photographic evidence was in addition to law enforcement testimony, lay witness testimony, expert testimony, lab technician testimony, and other recorded evidence including 911 tapes and the defendant's confession. Many witnesses testified about the gruesome injuries and crime scene.

We made clear in *Hall* that the probative value of each photograph, often of the same gruesome subject from a slightly different angle or distance, significantly reduced the probative value of the later pictures. We said:

> Not only will the probative worth of each additional gruesome photograph be incrementally discounted as the facts to be proven become ever more certain, but admission of additional photos will also correspondingly increase the danger of undue prejudice. That is, as the jury is confronted with gory image after gory image, the inflammatory and prejudicial effect of the images as a whole increases, while the marginal probativeness of each new image is less than the one before. The two concepts are inversely related, and at some point, the marginal probative worth of an additional photo will certainly be substantially outweighed by the risk that the jury's decision-making will be improperly influenced by bias, sympathy, or animosity engendered by the additional inflammatory evidence. In the present case, that point was far exceeded.

*Id.* at 826.

14

The issue of multiple and highly inflammatory photographs seen in *Hall* is not found in this case. When arguing for admission of the two internal injury photos, the Commonwealth informed the trial court it had reviewed and evaluated one hundred and twenty photographs, including hospital treatment photos and other more graphic autopsy photos. From those, the Commonwealth selected only four pictures to admit at trial. We note the Commonwealth did not even offer photographs of the child's eyeballs to show optic nerve sheath damage consistent with a sudden deceleration injury described by Dr. Springer.

Apart from the photographs, evidence of Prestyn's internal injuries that caused his death consisted of Dr. Nichols's testimony concerning the post-mortem X-rays and CT scan taken at Norton Children's Hospital revealing a skull fracture, three sub-scalp injuries, and a brain bleed. In addition to identifying and explaining these injuries, Dr. Springer described optic nerve sheath damage not shown in any photographs. As noted above, the internal injuries were not visible simply by looking at the child.

In *Hall*,

> There was no material dispute of the facts that the Commonwealth sought to use the photos to prove. And there was more than enough alternative evidence—including the less gruesome photos, extensive lay and expert witness testimony, and the crime scene video—to easily prove the same facts beyond a reasonable doubt.

*Id.* at 825.

We further stated in *Hall*, "[w]hile a few photos necessary to show the commission of the crimes and the nature of the victims' injuries were properly admitted, the numerous photos introduced thereafter were cumulative and added little, if any, persuasive force to the other evidence proving the crime and

15

the circumstances surrounding its commission." *Id.* at 826. The Commonwealth in this case used as few pictures as necessary to prove its case and did not offer repeated graphic images which was the compounding problem we identified in *Hall.* Here, there was no overwhelming and unnecessary piling up of graphic pictures.

Consistent with our directives in *Hall,* the Commonwealth's essential proof was accomplished with two graphic photos. The Commonwealth's restraint in choosing these four photographs from choices that included more graphic and unsettling possibilities and the trial court's careful weighing of the images' probative value versus prejudicial effect clearly sets this case apart from *Hall.* This record was not inundated and overwhelmed with an unnecessary number of graphic images. The four photographs used by Dr. Springer to explain his findings concerning the cause and manner of death directly support his testimony. These four photographs, instead of being the main focus of the Commonwealth's case, served as a visual tool for the jury.

In reviewing a case where the trial court admitted five autopsy photographs, we said

> Although disturbing, as by their nature autopsy photographs tend to be, the five photographs admitted here were no more than were reasonably necessary to provide illustration for the medical examiner's testimony and to support her findings. They were relevant as tending to show not only that the child had been fatally injured, but also that the fatal head injury was of a severity almost certain to have been inflicted and not likely to have happened accidentally.

*Staples v. Commonwealth,* 454 S.W.3d 803, 825–26 (Ky. 2014).

We reach the same conclusion in this case that we did in *Staples.* The trial court's admission of four photographs, including two of external injuries

16

and two revealing internal injuries, was supported by sound reasoning and applicable legal authority. The trial court did not abuse its discretion in the admission of the four autopsy photographs.

### III. CONCLUSION

After careful review of the issues presented, we affirm Bates's conviction and corresponding sentence. As we affirm Bates's conviction, we dismiss the Commonwealth's cross-appeal as moot.

All sitting. All concur.

COUNSEL FOR APPELLANT/CROSS-APPELLEE CODY BATES:

Leo Gerard Smith
Louisville Metro Public Defender

Yvette Rene' Delaguardia
Assistant Appellate Public Defender


COUNSEL FOR APPELLEE/CROSS-APPELLANT COMMONWEALTH OF KENTUCKY:

Daniel Jay Cameron
Attorney General of Kentucky

Jeanne Deborah Anderson
Special Assistant Attorney General

# Supreme Court of Kentucky

2019-SC-0121-MR
AND
2019-SC-0141-MR

CODY BATES                                                                    APPELLANT


ON APPEAL FROM JEFFERSON CIRCUIT COURT
v.            HONORABLE ANNIE O'CONNELL, JUDGE
NO. 17-CR-001730


COMMONWEALTH OF KENTUCKY                                     APPELLEE


## ORDER DENYING PETITION FOR REHEARING

The Petition for Rehearing, filed by the Appellant, of the Memorandum

Opinion of the Court, rendered April 30, 2020, is DENIED.

All sitting. All concur.

ENTERED: September 24, 2020.


_____
CHIEF JUSTICE